799 F.2d 1098
 123 L.R.R.M. (BNA) 2265, 55 USLW 2152,
104 Lab.Cas. P 11,984,
7 Employee Benefits Ca 2257
 CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS PENSION FUND
and Daniel J. Shannon, Plaintiffs-Appellees,
v.
KRAFTCO, INC., d/b/a Sealtest Foods Division, Defendant-Appellant.
KRAFT, INC., Plaintiff-Appellant,
v.
LOCAL UNION 327, TEAMSTERS, CHAUFFEURS, HELPERS AND TAXICAB
DRIVERS, Defendant- Appellee.
 Nos. 84-5518, 84-5868.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 4, 1986.
Decided Sept. 2, 1986.
 
 Terry M. Brooks, Larry W. Bridgesmith (argued), Constangy, Brooks & Smith, Nashville, Tenn., for defendant-appellant.
 Cecil Branstetter (argued), R. Jan Jennings, Branstetter, Kilgore, Stranch, Nashville, Tenn., for plaintiffs-appellees.
 Before LIVELY, Chief Judge, and ENGEL, KEITH, MERRITT, KENNEDY, MARTIN, JONES, CONTIE,* KRUPANSKY, GUY, NELSON, RYAN and BOGGS, Circuit Judges.
 CONTIE, Circuit Judge.
 
 
 1
 Appellant Kraftco, Inc., appeals from an order of the district court granting judgment in favor of plaintiffs Central States Southeast and Southwest Areas Pension Fund (hereinafter, Central States), Director Daniel J. Shannon, and Teamsters Local Union 327 (hereinafter Local 327) on plaintiffs' complaint seeking delinquent pension contributions pursuant to 29 U.S.C. Secs. 185, 1132, 1145. Finding the judgment of the district court premised on erroneous factual and legal conclusions, we reverse.
 
 I.
 
 2
 On April 11, 1978, plaintiffs Shannon and Central States filed a complaint against Sealtest Foods (Kraftco) pursuant to 29 U.S.C. Secs. 185, 1132, 1145, and state law. The complaint alleged that Kraftco was obligated to make contributions to Central States pursuant to a collective bargaining agreement between Local 327 and Kraftco, and that defendant "has failed and refused to make certain of the required payments as required on their respective dates." Central States sought $146,000 in delinquent contributions, collection costs, and attorney fees, and an order of specific performance of the collective bargaining agreement.
 
 
 3
 On February 6, 1979, Kraftco filed a complaint against Local 327 pursuant to 29 U.S.C. Sec. 185, and 28 U.S.C. Secs. 1337, 2201, 2202. The complaint alleged that "plaintiff and defendant have entered into successive formal collective bargaining agreements. In addition to these agreements, certain matters have been resolved through letters of understanding signed by duly authorized representatives of plaintiff and defendant." Pursuant to such a letter, Kraftco alleged that "regular pension payments on employees covered by the collective bargaining agreement ... were to commence only at such time as such employees had been in the employ of plaintiff for a period of thirty-six (36) months." Kraftco alleged that the union's insistence that the letter specifying the 36-month period was of no effect was a threatened breach of the collective bargaining agreement. Kraftco sought a declaratory judgment that Kraftco had no obligation to make the payments demanded by the union, that the letter agreement was a binding agreement, and that the union had violated the agreement. On March 30, 1979, the two cases were consolidated. Trial was held on March 15, 1982, and, on May 9, 1984, the court entered judgment against Kraftco in the amount of $246,395. 589 F.Supp. 1061 (M.D.Tenn.1984).[1] The following evidence was adduced at trial.
 
 
 4
 Royce McClintock, general manager of Kraftco, testified that he had final authority in collective bargaining matters, and that he was informed of the side agreement in question in 1974 by Don Spencer of Kraftco. McClintock testified that side agreements were a matter of general practice between Kraftco and Local 327. McClintock admitted that the 1969 side agreement was never mentioned in the 1975 negotiations.
 
 
 5
 T.H. Rose, employed by Kraftco prior to 1974 as general manager, had the final authority with respect to collective bargaining agreements, and was the chief company negotiator in 1966. Rose testified that the side agreement in question was executed on June 27, 1969 to "clarify the meaning of the contract," and was signed by himself and Union President Don Vestal. The collective bargaining agreement was signed that same day. The collective bargaining agreement provided that the company would make pension contributions for regular employees who started work, while the side agreement provided that the company would make payments only for employees who had been with the company for 36 months. Rose testified that the company understood a regular employee to be one who had been with the company for 36 months. Further, "[i]t was the understanding that this letter remain in effect until it was changed." Other side agreements were entered into and adhered to through consecutive collective bargaining agreements. Rose also testified that the letter agreement applied to the ice cream plant contract negotiated in August 1969. Rose could recall no mention of the side letter in later negotiations.
 
 
 6
 Donald Spencer conducted contract negotiations for Kraftco from 1965 to 1980, and indicated that Local 327 represented both milk plant and ice cream plant personnel. Spencer testified regarding past custom in executing letter agreements. Spencer testified that the company and union had entered into several letter agreements which altered the terms of the collective bargaining agreement upon the assent of a representative of the union and company. Spencer indicated that he was never informed that these letter agreements were subject to union ratification. Spencer further testified that the letter agreements were to remain in effect until "negotiated out."
 
 
 7
 Spencer indicated that he was the chief spokesman for the company during the 1969 negotiations, and that a member from the international union was present at times. Spencer testified that he was never told that any agreement between Local 327 and the company was conditioned on approval by the International, but that the International representative stated that the provision requiring employment for 36 months before contributions were paid would have to be changed. The 36-month requirement had been carried over from other agreements. Spencer testified that the 36-month period was desirable because of the high turnover of employees and enabled the company to avoid making contributions for persons who would never benefit from them. Spencer testified that in 1969 the parties agreed to continue the 36-month requirement through the letter agreement. The letter agreement also included a reference to making employees "whole." "Our intent ... was to make any employee of ours whole if by not paying benefit payments for his first 36 months of employment would cause him to have any loss of pension benefits." Spencer testified that, before the entire bargaining committee, Vestal indicated that he "would give us a letter concerning this 36-months' payment and that it would be no problem to delete the language from the contract."
 
 
 8
 Spencer testified that, to make employees "whole," Kraftco forwarded checks for the three years of contributions to Central States. Spencer further testified that Vestal told him that the letter agreement would apply to both the milk and ice cream plant contracts. Spencer testified that the union first complained about the contributions in 1977.
 
 
 9
 James Dreaden was a member of the Kraftco bargaining unit until 1975 when he joined management. Dreaden was a member of the union negotiating committee from 1963 to 1974, and indicated that the side agreement was discussed by the committee in 1969. Dreaden testified that it was his understanding that the letter agreement continued in effect through the subsequent collective bargaining agreements.
 
 
 10
 Dreaden testified:Q. ... I believe your testimony was that the company proposed that the 36 month exclusion would continue in 1969, is that correct?
 
 
 11
 A. That's true.
 
 
 12
 Q. Did the union accept that proposal in 1969?
 
 
 13
 A. When it was taken before the membership, it was ratified and then accepted.
 
 
 14
 On cross-examination,
 
 
 15
 Q. Just one question. You didn't have the side letter when it was taken to the union for ratification, did you?
 
 
 16
 A. No, sir.
 
 
 17
 Q. All right.
 
 
 18
 A. But it was explained and they were informed.
 
 
 19
 Q. They were informed of what? Were they informed of what was in the written contract or what was in the side letter that hadn't been printed at that time?
 
 
 20
 A. At the time that we had taken it to the membership for ratification, the contract per se was not in a contract form. We had taken the proposals and they accepted the proposals. Then it was compiled together as a contract.
 
 
 21
 Billy Burrows, business agent for the union in 1971, testified that he participated in negotiations with Kraftco and never heard of the letter agreement until 1977. Burrows testified that there was no copy of the letter in the union records. However, Burrows could find no record whatsoever of the 1969 negotiations.
 
 
 22
 The following documents were presented to the district court. The Trust Agreement creating Central States, as amended in 1957, provided in Article III Sec. 1 that "[e]ach Employer shall make continuing and prompt payments to the Trust Fund as required by the applicable Collective Bargaining Agreement between the parties. The obligation to make such contributions shall continue during periods when the Collective Bargaining Agreement is being negotiated." Further, "[t]his Agreement shall in all respects be construed according to and be governed by the laws of the State of Illinois." See 1970 Agreement, 1974 Agreement, 1978 Agreement.
 
 
 23
 The collective bargaining agreement, effective January 1, 1966 to December 31, 1968, provided:
 
 
 24
 The Employer shall pay to the Central States Southeast and Southwest Pension Fund ... the sum of four dollars ($4.00) per week, for each employee covered by this Agreement who has been on the payroll thirty-six (36) months or more.
 
 
 25
 The agreement, effective January 1, 1969 to December 31, 1971, and subsequent agreements, provided in Article XII:
 
 
 26
 The Employer shall pay to the Central States ... the sum of six dollars ($6.00) per week, for each employee covered by this Agreement upon his becoming a regular employee.
 
 
 27
 (Emphasis added).
 
 
 28
 The controversial letter agreement was type-dated June 26, 1969, hand-dated June 27, 1969, and signed by Rose and Spencer for Sealtest and Vestal for the union. The letter provided in full:
 
 
 29
 As per our conversation of June 26, 1969, and our agreement of such time, Sealtest Foods will continue to commence regular pension payments on our employees when such employees have been in our employ for a period of thirty-six (36) months. Said pension payments shall then continue as stipulated in our present labor agreement.
 
 
 30
 If you concur in this agreement, please sign one copy and return to us.
 
 
 31
 We realize this may require some possible discussion and adjustment for some specific individuals during the life of our labor agreement.
 
 
 32
 The union constitution provided in section 26(A):
 
 
 33
 Whenever a collective bargaining agreement is about to be negotiated, modified or extended at the request of this Local Union, the President shall call a meeting at which the membership shall determine and authorize the bargaining demands to be made.
 
 Subsection (B) provided:
 
 34
 Proposed collective bargaining agreements or amendments shall be submitted by the Secretary-Treasurer of the Joint Council and Area Conference, as required by the Area Conference Bylaws, for approval before submission to the employer.
 
 Subsection (C) provided in pertinent part:
 
 35
 Ratification of agreements or amendments shall be subject to vote in the same manner as provided for in connection with bargaining demands set forth in Section 26(A), or in the case of area-wide or conference-wide agreements in accordance with the Constitution and rules adopted by such bargaining group.
 
 
 36
 The district court viewed Central States' action as composed of claims pursuant to state law, 29 U.S.C. Sec. 185, and 29 U.S.C. Secs. 1132, respectively. 589 F.Supp. at 1069. The court held that all claims were timely. "Under Illinois law, the Fund's action for enforcement of the trust plans is essentially one for recovery of money pursuant to a written agreement." Id. at 1069 n. 1.[2] The court applied the Illinois ten-year limitations period. Ill.Rev.Stat. Ch. 110, Sec. 13-206. ERISA liability was further limited by 29 U.S.C. Sec. 1144(b)(1) which provides that "[t]his section shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975." Id. at 1070. With respect to the LMRA claims, the court held that Tennessee's six-year limitation period, Tenn.Code Ann. Sec. 28-3-109, limited recovery to acts after April 20, 1972. Id. at 1070.
 
 
 37
 The district court resolved the threshold question to be whether the side letter agreement was a valid alteration of the collective bargaining agreement. Id. at 1072. For several reasons, the court found that the side letter was void pursuant to 29 U.S.C. Sec. 186(c)(5).
 
 
 38
 It is the conclusion of this Court that the side letter of June 26, 1969 did not modify the terms of the milk plant bargaining agreement executed on June 27, 1969, the ice cream plant bargaining agrement executed later that year, or any succeeding agreements. The side letter is an obvious attempt to circumvent the terms of the collective bargaining agreements and clearly violates Sec. 302(c)(5)(B), 29 U.S.C. Sec. 186(c)(5)(B). The side letter was not presented to the Union membership for ratification as required by Union by-laws, nor was it communicated to the affected Union members. Kraftco, as a signatory of the collective bargaining agreements, either knew or should have known of the ratification process. Thus, this Court rejects as unfounded Kraftco's contention that Vestal had any authority implied or apparent to approve the side letter. Although there is a history of occasional side letters between Kraftco and the Union, most of them concern routine matters not covered by any collective bargaining agreements. The letter of November 8, 1966 modified the collective bargaining agreement without ratification by the membership, but this does not establish a binding precedent upon which Kraftco may rely. The critical disposition between the side letter agreement at issue in this case and the other side letters between the Union and Kraftco is that the previous side letters, unlike the side letter in question, did not diminish the rights of any Kraftco employee--Union member.The Congressional concern embodied in Sec. 302(c)(5)(B) to protect union funds exacted from employers for employees and their families would be frustrated if a union official could unilaterally bind the Union to a side letter agreement with the employer, absent any authority or notice to the Union. The objective of Congress is plain. Employer payments to trust funds must be pursuant to a written agreement with a detailed basis for payment. Although the written agreement may be modified that can only occur pursuant to proper Union authority. No such authority was delegated to Vestal in the present case and, more significantly, the side letter agreement was never ratified by the Union according to the Union's by-laws in 1969 or thereafter. The side letter agreement Vestal entered into with Kraftco to govern Kraftco's contributions to the trust funds was an illicit attempt to alter the effect of the written collective bargaining agreement. Such a practice is precluded under Sec. 302(c)(5)(B).
 
 
 39
 Id. at 1073-74. The court rejected Kraftco's estoppel argument on the ground that such a theory would violate Sec. 302(c)(5)(B). Id. at 1075. The court relied on the fact that the union and Central States had no knowledge of the side agreement.
 
 
 40
 On November 26, 1985, we affirmed the judgment of the district court, with each judge writing separately. On February 18, 1986, the court vacated the panel's decision and ordered that the case be heard en banc. The parties have filed supplemental briefs.
 
 II.
 
 41
 Central State's action is comprised of claims based on three different theories. First, Central States seeks to recover for breach of the trust agreement pursuant to ERISA, 29 U.S.C. Sec. 1132(a). Second, Central States, as a third-party beneficiary of the collective bargaining agreement, seeks to recover based on Kraftco's alleged breach of the collective bargaining agreement pursuant to 29 U.S.C. Sec. 185, section 301 of the Labor Management Relations Act. Third, Central States seeks to recover for breach of the trust agreement pursuant to state law. Accordingly, we consider the periods of limitation applicable to these actions.
 
 A.
 
 42
 The district court properly noted that ERISA only applies to acts occurring after January 1, 1975. 29 U.S.C. Sec. 1144(a), (b)(1).[3] See 29 U.S.C. Sec. 1114(a). Accordingly, suits for violation of the trust agreements based on acts or omissions occurring prior to that date cannot be prosecuted under ERISA.
 
 
 43
 Apart from section 1144(b)(1), ERISA does not provide a period of limitation applicable to the pending case.[4] "When Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so." Wilson v. Garcia, 471 U.S. 261, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254 (1985) (footnote omitted) (applying 42 U.S.C. Sec. 1988); United Automobile Workers v. Hoosier Cardinal Corp., 383 U.S. 696, 703-04, 86 S.Ct. 1107, 1112, 16 L.Ed.2d 192 (1966). See DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 158, 103 S.Ct. 2281, 2287, 76 L.Ed.2d 476 (1983). "By adopting the statute governing an analogous cause of action under state law, federal law incorporates the State's judgment on the proper balance between the policies of repose and the substantive policies of enforcement embodied in the state cause of action." Wilson, 105 S.Ct. at 1945. In following this analysis, "we must characterize the essence of the claim in the pending case, and decide which state statute provides the most appropriate principle." Wilson, 105 S.Ct. at 1943. "The characterization of ... [plaintiff's claim] for statute of limitations purposes is derived from the elements of the cause of action, and Congress' purpose in providing it. These, of course, are matters of federal law." Id.; DelCostello, 462 U.S. at 159 n. 13, 103 S.Ct. at 2288 n. 13; United Parcel Service, Inc. v. Mitchell, 451 U.S. 56, 60-61, 101 S.Ct. 1559, 1563, 67 L.Ed.2d 732 (1981) (how an action is characterized "depends upon an examination of the nature of the federal claim and the federal policies involved."); Hoosier Cardinal Corp., 383 U.S. at 706, 86 S.Ct. at 1113. However, "there is no reason to reject the characterization that state law would impose unless that characterization is unreasonable or otherwise inconsistent with national labor policy." Hoosier Cardinal Corp., 383 U.S. at 706, 86 S.Ct. at 1113; Headrick v. American District Telegraph Co., 526 F.Supp. 604, 606 (E.D.Tenn.1980). But this deference is "a matter of preference or comity--not obligation." Wilson, 105 S.Ct. at 1944 n. 22.
 
 
 44
 In actions for breach of trust agreements under ERISA the courts have applied periods of limitation for actions for breach of written contracts. See Jenkins v. Local 705 International Brotherhood of Teamsters Pension Plan, 713 F.2d 247, 253 (7th Cir.1983); Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan, 698 F.2d 593, 598 (2d Cir.), cert. denied, 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983); Haynes v. O'Connell, 599 F.Supp. 59, 62 (E.D.Tenn.1984); Nolan v. Aetna Life Insurance Co., 588 F.Supp. 1375, 1379 (E.D.Mich.1984). But see Cowden v. Montgomery County Society for Cancer Control, 591 F.Supp. 740, 755 (S.D.Ohio 1984) (applying statute for actions based "upon a liability created by statute"). Tennessee law specifies a six-year limitation period for actions on written contracts, which appears applicable to this action. Haynes, 599 F.Supp. at 62; Tenn.Code Ann. Sec. 28-3-109(a)(3).[5]
 
 
 45
 Kraftco contends, however, that the six-month period specified in 29 U.S.C. Sec. 160(b)[6] for filing complaints with the National Labor Relations Board renders the state statute inapplicable on the ground that the pending case is not a simple contract claim, but rather an attack on the negotiating process akin to an action for breach of the duty of fair representation. See DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). Kraftco argues that
 
 
 46
 [b]ecause a challenge to an employer's decision relative to pension obligations constitutes a challenge to the finality of the decision-making process agreed upon between the employer and the union, such claims are to be measured by the principles of exclusive representation and the union's duty to fairly carry out its obligation to all unit employees. To claim that the contract has been breached by the employer is to challenge the "fairness of the decision-making process" in effect between the union and the employer. Thus, such suits are by their nature a challenge both to the employer's adherence to contract terms and the union's extinguishment of its fair representation obligations.
 
 Specifically, Kraftco argues:
 
 47
 The gravamen of the Fund's complaint is that the thirty-six (36) month deferral practice embodied in the June 27, 1969, letter agreement is an unenforceable condition on Kraft's duty to make contributions to the Fund. The very process of collective bargaining has been implicated by the complaint in this case. The Fund has alleged that Kraft had no right to rely upon the representations of Local 327 as the exclusive bargaining representative of Kraft's employees. The Fund thus has attempted to establish that the resultant agreement breached the union's duty to bargaining unit members.
 
 
 48
 For several reasons, we reject Kraftco's arguments and find application of the six-month period inappropriate. First, Central States' complaint in this case is lodged solely against the employer and relates solely to the employer's failure to comply with the terms of the collective bargaining agreement. Central States' complaint does not allege a breach of the duty of fair representation and can in no way be construed to allege improper action by the union or any of its members.
 
 
 49
 Second, the facts upon which Central States bases its claim simply do not implicate the duty of fair representation. In NLRB v. Local 299, International Brotherhood of Teamsters, 782 F.2d 46, 50 (6th Cir.1986), we noted, analyzing Supreme Court and circuit precedent, that "[t]he duty of fair representation has primarily been associated with contract negotiation and the enforcement of that contract through grievance processing." (Footnotes omitted). We declined to expand the duty "to include an undefined fiduciary duty which a union owes to its unit as a whole," and held that the duty "was never intended to be a 'catch all' for undesirable union activity." Id. at 51. "[T]he duty of fair representation is implicated only when an individual or group is treated differently by a union ... than another individual, group or the collective." Id. at 51-52. Since the complaint did not allege a breach of the duty of fair representation and the factual basis of the complaint does not implicate differential treatment, we cannot characterize the claim as one for breach of the duty of fair representation.
 
 
 50
 Third, the issues in this case are what constitutes the contract of the parties and whether the employer complied with that contract, and may be decided by reference to principles of contract and agency law apart from the federal statutes that procedurally give rise to these claims and our jurisdiction. Central States' action is, so to speak, a creature of contract law, rather than labor law. United Independent Flight Officers, Inc. v. United Air Lines, Inc., 756 F.2d 1262, 1272 (7th Cir.1985); Jenkins, 713 F.2d at 253 n. 7.
 
 
 51
 Fourth, DelCostello does not require a different result. In DelCostello, the Court held that the six-month limitation period of 29 U.S.C. Sec. 160(b), governing unfair labor practices before the NLRB, applied to actions pursuant to 29 U.S.C. Sec. 185 alleging the employer's breach of a collective-bargaining agreement and the union's breach of its duty of fair representation. The Court recognized that "state statutes of limitations can be unsatisfactory vehicles for the enforcement of federal law" and that "it may be inappropriate to conclude that Congress would choose to adopt state rules at odds with the purpose or operation of federal substantive law." 462 U.S. at 161, 103 S.Ct. at 2289. Further, the Court found "no close analogy in ordinary state law," id. at 165, 103 S.Ct. at 2291, for the hybrid Sec. 301 claim and reject application of state arbitration statutes because of the poor analogy and brevity of the period provided, typically 30 to 90 days. Id. at 166, 103 S.Ct. at 2291. The Court rejected the analogy to state malpractice statutes, in part on the ground that "application of a longer malpractice statute as against unions would preclude the relatively rapid final resolution of labor disputes favored by federal law." Id. at 168, 103 S.Ct. at 2292. The Court settled on the six-month period in part to avoid applying different limitation periods to the Sec. 301 hybrid claims, an element not present in the pending case. Id. at 169 n. 19, 103 S.Ct. at 2293 n. 19.
 
 
 52
 DelCostello does not compel application of section 10(b) in this case. We have held that "[a]ttention to the reasoning of DelCostello and its own express limitations indicate that DelCostello is not a 'green light' to apply 29 U.S.C. Sec. 160(b) to all actions in which federal labor law is implicated." Carruthers Ready-Mix, Inc. v. Cement Masons Local Union No. 520, 779 F.2d 320, 327 (6th Cir.1985);[7] Champion Int'l Corp. v. United Paperworkers Int'l Union, 779 F.2d 328 (6th Cir.1985). Tennessee law, as discussed above, provides a limitation period for state actions which are analogous to the ERISA claims in this case, unlike DelCostello in which no state limitation period represented a balancing of the unusual combination of interests implicated in a hybrid Sec. 301 action. Further, application of the state limitation period is not inconsistent with the policies underlying federal labor law. DelCostello emphasized that rapid resolution of labor disputes is favored when the collective bargaining process is threatened. However, "speed and finality may not be as pressing concerns where the underlying dispute concerns a pension plan rather than day-to-day employment matters." United Independent Flight Officers, Inc., 756 F.2d at 1273; Edwards v. Wilkes-Barre Publishing Co. Pension Trust, 757 F.2d 52, 55 (3d Cir.), cert. denied, --- U.S. ---, 106 S.Ct. 130, 88 L.Ed.2d 107 (1985); Adams v. Gould, Inc., 739 F.2d 858, 867 (3d Cir.1984), cert. denied, 469 U.S. 1122, 105 S.Ct. 806, 83 L.Ed.2d 799 (1985).[8] Therefore, DelCostello does not require application of section 10(b) in this case.
 
 
 53
 Accordingly, since this is not a duty of fair representation case, and since DelCostello does not require deviation from the traditional rule of resort to state statutes of limitations, we hold that the six-year period provided by Tennessee law applies to Central States' ERISA claims.
 
 B.
 
 54
 Central States also maintains an action, as third-party beneficiary, for breach of the collective bargaining agreement pursuant to section 301 of the LMRA. The district court held that the six-year Tennessee period of limitations for contract actions applied. We have previously held that actions based on breach of a collective bargaining agreement are governed, under Tennessee law, by Tenn.Code Ann. Sec. 28-3-109 and its predecessors which specify a six-year period of limitation.[9] Sanders v. Louisville & N.R. Co., 144 F.2d 485, 486 (6th Cir.1944). See Haynes, 599 F.Supp. at 62. This is consistent with other courts which have applied state limitation periods for contract actions to claims under section 301 for breach of collective bargaining agreements. Smith v. Kerrville Bus Co., 748 F.2d 1049, 1051 (5th Cir.1984); O'Hare v. General Marine Transport Corp., 740 F.2d 160, 167-68 (2d Cir.1984), cert. denied, 469 U.S. 1212, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985). See Int'l Ass'n of Machinists v. Allied Products Corp., 786 F.2d 1561, 1563 (11th Cir.1986). Accordingly, the district court did not err in applying the six-year limitation period.
 
 C.
 
 55
 The district court concluded that state law claims for breach of the trust agreement were subject to the ten-year limitations period under Illinois law and survived ERISA's preemption provisions. However, as Kraftco argues in its supplemental brief to the en banc court, state claims for breach of the trust agreement are clearly preempted by 29 U.S.C. Sec. 185.[10] In Allis-Chalmers v. Lueck, 105 S.Ct. 1904 (1985), the Court held that section 301 preempted a state claim for bad faith handling of an insurance claim by the plaintiff's employer and insurer. State law contract claims are preempted "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract." Id. at 1916. The Court focused on whether state law "confers nonnegotiable state law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the [state law] claim is inextricably intertwined with consideration of the terms of the labor contract." Id. at 1912.
 
 
 56
 The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort. Any other result would elevate form over substance and allow parties to evade the requirements of Sec. 301 by re-labeling their contract claims as claims for tortious breach of contract.
 
 
 57
 Were state law allowed to determine the meaning intended by the parties in adopting a particular contract phrase or term, all the evils addressed in [Teamsters v.] Lucas Flour [Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593] would recur. The parties would be uncertain as to what they were binding themselves to when they agreed to create a right to collect benefits under certain circumstances. As a result, it would be more difficult to reach agreement, and disputes as to the nature of the agreement would proliferate.
 
 
 58
 105 S.Ct. at 1911. In this case it is clear beyond peradventure that the state action for breach of the trust agreement which incorporates the collective bargaining agreement is dependent on analysis of the labor contract, and our attention is drawn to no non-negotiable state created rights independent of the collective bargaining agreement. Accordingly, the "claim must either be treated as a Sec. 301 claim, ... or dismissed as pre-empted by federal labor-contract law." Id. at 1916. Accordingly, the state law claim for breach of the trust agreement is preempted by section 301.[11]
 
 III.
 
 59
 Pursuant to Fed.R.Civ.P. 52(a), we review the district court's findings of fact for clear error. In Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), the Court reiterated that a reviewing court may only overturn the district court's findings when the court "is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "The reviewing court oversteps the bounds of its duty under Rule 52 if it undertakes to duplicate the role of the lower court." Anderson, 105 S.Ct. at 1511. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Id. at 1512. Further, "[w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in which is said." Id. However, "construction of collective bargaining agreements and employee benefit plans is a question of law fully reviewable by this court." Teamsters Local 348 Health & Welfare Fund v. Kohn Beverage, Inc., 749 F.2d 315, 317-18 (6th Cir.1984), cert. denied, 471 U.S. 1017, 105 S.Ct. 2024, 85 L.Ed.2d 305 (1985).[12]
 
 
 60
 In this case, the district court held that the letter agreement was not a valid modification of the collective bargaining agreement pursuant to 29 U.S.C. Sec. 186, section 302 of the LMRA, apparently reaching this conclusion based on three subsidiary premises: that the agreement was not ratified, that the union president had no authority to enter into the agreement, and that past letter agreements did not constitute a course of dealing.[13] The district court did not conclude that, as a matter of contract law, its findings required the conclusion that, independent of 29 U.S.C. Sec. 186, the letter agreement did not modify the collective bargaining agreement. However, because this alternative ground upon which to uphold the district court's decision is clearly suggested by its findings, we consider it here.
 
 A.
 29 U.S.C. Sec. 186(a) provides:
 
 61
 It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value--
 
 
 62
 (1) to any representative of any of his employees who are employed in an industry affecting commerce.
 
 
 63
 29 U.S.C. Sec. 186(c)(5) provides an exception to this proscription.[14] "If any one of these exceptions applies, the general prohibition of Sec. 302 does not operate." The Washington Post v. Washington-Baltimore Newspaper Guild, Local 35, 787 F.2d 604, 606 (D.C.Cir.1986). Section 302(e) provides only for injunctive relief, 29 U.S.C. Sec. 186(e); Sellers v. O'Connell, 701 F.2d 575, 578 (6th Cir.1983), and criminal penalties, 29 U.S.C. Sec. 186(d).[15] However, the Supreme Court has recognized that illegal payments are an exception to an employer's obligations under ERISA. Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 88, 102 S.Ct. 851, 862, 70 L.Ed.2d 833 (1982) (29 U.S.C. Sec. 1145). Further, "a federal court has a duty to determine whether a contract violates federal law before enforcing it." Id. at 83, 102 S.Ct. at 859.
 
 
 64
 The purpose of section 302 is to "punish certain criminal activity in the conduct of union affairs, and thereby help to drive criminals from the labor movement." H.Rep. No. 741, 86th Cong., 1st Sess., reprinted in 1959 U.S. Code Cong. & Ad. News 2318, 2433. The statute was amended in 1959
 
 
 65
 in order to clarify certain ambiguities which have arisen under existing law. Under existing law it is illegal for an employer to pay or deliver anything of value to a representative of his employees, except in those instances permitted by subsection (c) of section 302. The purpose of these amendments to section 302 is to forbid any payment, loan, or bribe by an employer, employer association, or anyone acting on an employer's behalf.... The demand or acceptance of such payment, loan, or bribe is also proscribed.
 
 
 66
 Id. at 2469. See The Washington Post, 787 F.2d at 606-07.
 
 
 67
 The district court held that the side letter was invalid because it violated section 302(c)(5), an exception to the proscriptions of section 302(a). Of course, prior to application of the exceptions, section 302(a) must be applicable in the first instance. Section 302(a) makes unlawful an agreement by an employer to pay money to a union representative (the trust fund). The agreement to pay in this case is the collective bargaining agreement, the validity of which none of the parties challenge. The side letter in this case is either an agreement not to pay money or an agreement limiting a preexisting valid obligation to pay money. The side letter did not implicate the transfer of anything of value from the employer to the union. Central States does not allege that Kraftco paid Vestal for entering into the side agreement. Accordingly, since this is not the type of case Congress intended to reach in enacting section 302, section 302 is not applicable to this case.[16]
 
 B.
 
 68
 Central States does not claim that the use of letter agreements is per se invalid.[17] Rather, Central States argues that the failure of the membership to ratify the letter agreement rendered it void. "[T]he claim that the ... agreement is invalid for failure to obtain ratification involves a simple contractual principle attacking the formation of a contract." Goclowski v. Penn Central Transportation Co., 571 F.2d 747, 756 (3d Cir.1978). "A collective bargaining agreement must be ratified by a union's membership only if the union's constitution, by-laws or rules and regulations create such a requirement. There is no independent requirement in federal law of ratification by a union." Meyerson v. Contracting Plumbers Ass'n, 606 F.Supp. 282, 287 (S.D.N.Y.1985); Confederated Independent Unions v. Rockwell-Standard Co., 465 F.2d 1137, 1140 (3d Cir.1972); Conran v. Great Atlantic & Pacific Tea Co., 499 F.Supp. 727, 730 (E.D.Pa.1980). It is clear that the union constitution included a ratification requirement in this case. However, there was testimony in the record by James Dreaden, a member of the union negotiating committee, that in fact the content of the side letter had been presented to the membership and ratified. The district court did not discuss Dreaden's testimony or rule on its credibility or lack thereof. No other union official testified with respect to whether or not the letter had been ratified and Kraftco negotiators expressed a lack of knowledge regarding whether or not ratification was required. In light of the record, the district court erred in not concluding that the letter had been ratified, and that, therefore, Kraftco had not violated the terms of the collective bargaining and trust agreements.[18]
 
 
 69
 Even were we to assume that the district court disregarded Dreaden's testimony as not credible, we would still be compelled to reverse since we conclude that the union president had apparent authority to enter into the letter agreement referring to the 36-month payment deferral. Even in the presence of a ratification requirement, "an employer may rely upon the apparent authority of the Union representatives to conclude an agreement, where there is a basis for such reliance." NLRB v. Truckdrivers, Chauffeurs & Helpers, Local Union No. 100, 532 F.2d 569, 571 (6th Cir.), cert. denied, 429 U.S. 859, 97 S.Ct. 160, 50 L.Ed.2d 137 (1976); NLRB v. International Union of Elevator Constructors Local No. 8, 465 F.2d 974, 975 n. 1 (9th Cir.1972) ("When a union representative indicates that he has authority to enter into a binding agreement without membership ratification, and there is an established history of entering into bargaining agreements without such ratification, the Union cannot later contend that ratification is necessary."). But see Goclowski, 571 F.2d at 759 ("an employer has no right to rely on the appearance of authority of the bargaining agent if it has knowledge to the contrary").
 
 
 70
 29 U.S.C. Sec. 185(b) provides that "[a]ny labor organization which represents employees in an industry affecting commerce as defined in this chapter ... shall be bound by the acts of its agents." Subsection (e) provides that, "[f]or the purposes of this section, in determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." These provisions have been construed as adopting common law standards of agency. Carbon Fuel Co. v. United Mine Workers, 444 U.S. 212, 217, 100 S.Ct. 410, 414, 62 L.Ed.2d 394 (1979); Aguirre v. Automotive Teamsters, 633 F.2d 168, 171 (9th Cir.1980). "[T]he purpose of these provisions was merely to apply the ordinary rules of the law of agency to labor organizations, notwithstanding resolutions on their part disclaiming responsibility for the action of persons who, in reality, are acting in their behalf." United Construction Workers v. Haislip Baking Co., 223 F.2d 872, 878 (4th Cir.), cert. denied, 350 U.S. 847, 76 S.Ct. 87, 100 L.Ed. 754 (1955).
 
 
 71
 With respect to agency and apparent authority, we have held that common law principles are not to be applied rigidly. Further,
 
 
 72
 [t]he question whether an employee is an agent is a question of fact.... An employee's conduct may also be attributed to the union if the objector can demonstrate that the union has clothed the employee with apparent authority to act on behalf of the union.... At the minimum, the party seeking to hold the Union responsible for an employee's conduct based upon the theory of apparent authority must show that the union cloaked the employee with sufficient authority to create a perception among the rank-and-file that the employee acts on the behalf of the union ... and that the union did not disavow or repudiate the employee's statements or actions.
 
 
 73
 Kitchen Fresh, Inc. v. NLRB, 716 F.2d 351, 355 (6th Cir.1983). See Consolidation Coal Co. v. UMW, 725 F.2d 1258, 1262-63 (10th Cir.1984); Dogherra v. Safeway Stores, Inc., 679 F.2d 1293, 1295 (9th Cir.), cert. denied, 459 U.S. 990, 103 S.Ct. 346, 74 L.Ed.2d 386 (1982) ("A finding that one person is another's agent is generally reviewed as a question of fact, governed by the clearly erroneous standard.... The nature and extent of the agent's authority and whether apparent authority existed are also questions of fact."); North River Energy Corp. v. UMW, 664 F.2d 1184, 1190-92 (11th Cir.1981); Shimman v. Frank, 625 F.2d 80, 94-96 (6th Cir.1980); Mullett v. NLRB, 571 F.2d 1292, 1294 (4th Cir.1978).
 
 
 74
 The First Circuit has held that a provision in a union's constitution that the local union cannot bind the international without the latter's written consent did not prohibit a finding of apparent authority. Moreau v. James River-Otis, Inc., 767 F.2d 6 (1st Cir.1985).
 
 
 75
 Apparent authority cannot be established merely by showing that the agent claimed authority or purported to exercise it, but must be established by proof of something said or done by the principal on which a third person reasonably relied. The burden of proving apparent authority rests on the party asserting that the act was authorized.
 
 
 76
 ... Apparent authority can, therefore, be created only by the principal's manifestations to a third party.... The agent's representations of authority to a third person, standing alone, are insufficient to create apparent authority in the agent to act for the principal.
 
 
 77
 Id. at 9-10 (footnotes omitted). See also Meyerson, 606 F.Supp. at 288-90. The court warned that "[m]anagement should neither be allowed nor required to scrutinize internal union policies and practices too closely, and, indeed, it may commit an unfair labor practice if it delves too deeply into the union's affairs." Id.[19]
 
 
 78
 Authority may be inferred from custom or practice between the union and employer. NLRB v. Brotherhood of Painters, Decorators, & Paperhangers, Local Union No. 1385, 334 F.2d 729, 731 (7th Cir.1964) (history of contract negotiations); Local 692, United Food & Commercial Workers Union v. Pantry Pride, Inc., 522 F.Supp. 1009, 1013 n. 2 (D.Md.1981). Royce McClintock of Kraftco testified that it was a "general practice" of the union and company to enter into side agreements to "better define" the obligations of the parties under the collective bargaining agreement. Donald Spencer testified that he was never informed that past side agreements which altered the terms of the collective bargaining agreement were subject to ratification. Spencer also testified that the effectiveness of the letter agreement was not dependent on ratification. Rose testified that he had no reason to believe that Vestal was without authority to enter into the contested side agreement. Spencer testified that the company declined to question Vestal's authority to enter into the agreement for fear that such might subject the company to an unfair labor practice charge.
 
 
 79
 Nine side letter agreements are cited by the parties, two of which were executed prior to the letter agreement at issue in this case. In a letter of November 8, 1966, signed by Spencer for Kraftco and the vice president of the union, the parties agreed to changes in the collective bargaining agreement with respect to compensation and bidding of routes. The previous contract is not included in the record; therefore, it is impossible to conclude, as did the district court, that this letter did not diminish the rights of union members. 589 F.Supp. at 1074. A letter agreement of February 1, 1968, signed by company and union representatives, eliminated the classification of shipping clerk and created the classification of head boxman and set out the position's duties and qualifications.[20] These two agreements involved substantive changes in the collective bargaining agreement and there is no evidence that either was ratified by the union membership before being adhered to by the union and the company.
 
 
 80
 Accordingly, it is clear from the testimony of Kraftco employees and the conduct of the union and fund that none of the parties considered ratification a prerequisite to the validity of the side letter agreement. Further, the union's entry into and compliance with the prior letter agreements constituted representations by the union to the employer that union officials were authorized to enter into side letter agreements modifying the collective bargaining agreement without ratification.[21] Therefore, the district court's findings of fact to the contrary are clearly erroneous.[22]
 
 
 81
 Accordingly, the judgment of the district court is REVERSED.
 
 
 82
 ENGEL, Circuit Judge, concurring in result.
 
 
 83
 I concur in reversal but for the reasons stated by Judge Guy in his separate concurrence, which I join. I am particularly concerned with Judge Contie's reliance upon the testimony of James Dreaden. While the trial judge did not make a specific credibility finding with respect to the testimony of Dreaden, it is apparent from his findings that he rejected Dreaden's testimony that the Union membership knew of and ratified the letter agreement. Since by the time he testified at the trial, Dreaden had left his position as a member of the Kraftco bargaining unit and joined management, the trial judge's apparent decision not to credit his testimony has some support based upon the witness' change in interest. I do not believe we may appropriately rely upon the accuracy of Dreaden's testimony given some years later and after he had assumed a different role and hence had acquired different loyalty, at least where the district judge who heard his testimony apparently did not. This same problem was correctly noted by United States District Judge DeMascio in his special concurrence in the original panel decision.
 
 
 84
 RALPH B. GUY, Jr., Circuit Judge, concurring in result.
 
 
 85
 Although I concur in the decision to reverse the district court, I cannot concur in two of the several conclusions which led to that result. The first is that found in part III A of Judge Contie's opinion to the effect that Sec. 302 is not applicable here. Given the purpose of this legislation and its remedial nature, I believe the district court correctly found Sec. 302(c)(5)(B) to be applicable. Simply put, Sec. 302(a) prohibits employers from giving money or other things of value to labor unions except in certain well defined instances. One such instance, set forth in Sec. 302(c)(5)(B), is where the money is to be used as a trust fund for the sole and exclusive benefit of the employees. Recognizing, however, that to require only the stating of a purpose without more would leave the door open for abuse, Congress also mandated that "the detailed basis on which such payments are to be made is specified in a written agreement...."
 
 
 86
 The district court finding what it believed to be an unratified and unauthorized side letter agreement concluded that this agreement in combination with the collective bargaining agreement would not constitute the "detailed basis" for the making of payments required by the statute. The majority conclusion that the side letter agreement was an agreement "not to pay money" and "did not implicate the transfer of anything of value from the employer to the union," I think misperceives the trial judge's holding. The trial judge did not rule that the side letter violated Sec. 302 but, rather, that the nature and manner of entering into the side letter agreement violated the "detailed basis" requirement of Sec. 302(b). Although this would be a conclusion of law reviewable de novo by this court, this is not the basis on which the majority rejects the applicability of Sec. 302. I am nonetheless able to concur in the result because of footnote 16 to the majority opinion which sets out an alternative and, to me at least, sounder basis for rejection of the trial court's conclusion on this issue.
 
 
 87
 I am also uncomfortable with the majority's rejection of what is at least an implicit finding by the trial judge that the side letter agreement was never ratified as the union constitution required. This would be a factual finding and, as such, is only reversible if clearly erroneous. I would readily agree that the record is underdeveloped on this point, but that is the fault of the parties not the trial judge, and we are required to give the trial judge the benefit of the doubt on factual findings. Fed.R.Civ.P. 52(a). Here again, however, the majority's alternative theory on the apparent authority of the union president to bind the union even without ratification appears supportable both by custom and practice as well as decisional authority.[1]
 
 
 
 *
 The Honorable Leroy J. Contie, Jr., assumed senior status on July 1, 1986
 
 
 [1]
 On September 17, 1979, Central States, Shannon, and Local 327 moved for summary judgment. On July 16, 1981, the district court granted the union's motion to dismiss Kraftco's action against the union, but denied other motions, holding that "resolution of the central dispute in this action depends upon the intent of Kraft, Inc. and the Union in their execution of Collective Bargaining Agreements after April 20, 1972." 527 F.Supp. 420, 422 (M.D.Tenn.1981). On June 23, 1982, we reversed the district court's dismissal of Kraftco's action against the union. 683 F.2d 131 (6th Cir.1982)
 
 
 [2]
 The court held:
 In reviewing the trustees' decision under the laws of the state of Illinois, this Court recognizes that the jurisdictional basis for review rests upon 28 U.S.C. Sec. 1332 diversity of citizenship. Pursuant to the doctrine enumerated in Erie R.R. v. Tompkins, [304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188] ... this Court must apply the substantive law of Tennessee including Tennessee conflict of laws.... The general conflicts rule in Tennessee governing contracts is that the law of the place of making governs unless the parties express a contrary intent for another state's law to apply.... In this case the parties have agreed in the trust agreement that all disputes would be governed under Illinois law. Such an agreement is not contrary to the public policy of Tennessee.... Thus, the Trustee's decision that the side letter agreement modifying the obligation of Kraftco to make pension contributions is examined under the laws of the state of Illinois.
 
 
 [589]
 F.Supp. at 1070-71 n. 2
 
 
 [3]
 These subsections provide:
 (a) Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.
 (b)(1) This section shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975.
 
 
 [4]
 Neither of the parties argue that 29 U.S.C. Sec. 1113 applies to this case, and we, accordingly, do not consider this issue
 
 
 [5]
 Although the trust agreement specified that it was to be governed and construed in accord with Illinois law, plaintiffs' claims are brought pursuant to the federal statutory cause of action created by Congress in 29 U.S.C. Sec. 1132. Accordingly, we are bound to apply neither Illinois procedural nor substantive law. See Champion Int'l Corp. v. United Paperworkers Int'l Union, 779 F.2d 328, 333 (6th Cir.1986). See also Allis-Chalmers v. Lueck, 471 U.S. 202, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985); In re White Farm Equipment Co., 788 F.2d 1186, 1191 (6th Cir.1986). Application of the ten-year Illinois period, argued by the plaintiffs and adopted by the district court, would not require a different result since ERISA claims are available only from January 1, 1975, see note 3, supra, and, accordingly, would not be barred regardless of whether Illinois or Tennessee law applies
 Kraftco also contends that Tenn.Code Ann. Sec. 50-2-205 provides the appropriate limitation period. That section provides that "[c]ourt action under this part may be commenced no later than two (2) years after the cause of action occurs." "[T]his part" apparently refers to Tenn.Code Ann. Sec. 50-2-202 which prohibits discrimination in pay based on sex. Accordingly, the two-year period is inapplicable.
 
 
 [6]
 29 U.S.C. Sec. 160(b) provides in pertinent part:
 [N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board....
 
 
 [7]
 In DelCostello, the Court held:
 We stress that our holding today should not be taken as a departure from prior practice in borrowing limitations periods for federal causes of action, in labor law or elsewhere. We do not mean to suggest that federal courts should eschew use of state limitations periods anytime state law fails to provide a perfect analogy.... On the contrary, as the courts have often discovered, there is not always an obvious state-law choice for application to a given federal cause of action; yet resort to state law remains the norm for borrowing of limitations periods.
 462 U.S. at 171, 103 S.Ct. at 2294.
 
 
 [8]
 In Adams, the plaintiffs alleged that the union breached its duty of fair representation in settling pension disputes with the employer. The court held that 29 U.S.C. Sec. 1113 governed the claim rather than 29 U.S.C. Sec. 160(b). Adams is, of course, different from this case in that Adams was plainly a duty of fair representation case challenging the union's conduct while Central States challenges not the union or Vestal's conduct as proper or improper, but rather argues that the side letter has no effect as a matter of contract law. Accordingly, we cite Adams for the propositions that DelCostello does not require application of section 10(b) in all labor cases and that cases involving pension obligations may implicate special concerns. We express no opinion with respect to the holding of Adams on its facts, and recognize the concerns expressed by Justices White, Powell and Brennan in their dissent to denial of the petition for certiorari in that case. 105 S.Ct. at 808
 
 
 [9]
 Tenn. Code Ann. Sec. 28-3-109(a)(3) provides:
 The following actions shall be commenced within six (6) years after the cause of action occurred.
 * * *
 (3) Actions on contracts not otherwise expressly provided for.
 
 
 [10]
 Although it is unclear whether Kraftco raised this argument before the district court, the issue of survival of state claims is clearly presented by the district court's analysis. We do not decide that district courts need address this preemption question sua sponte. Int'l Longshoremen's Ass'n v. Davis, --- U.S. ---, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986)
 
 
 [11]
 But see Carpenters Health & Welfare Fund of Philadelphia & Vicinity v. Ambrose, Inc., 727 F.2d 279, 282 n. 5 (3d Cir.1983)
 
 
 [12]
 The district court held that the side letter agreement was void under any standard of review. 589 F.Supp. at 1074
 
 
 [13]
 Judge DeMascio's concurring opinion to the panel's disposition of the appeal notes that Kraftco did not challenge in its brief on appeal the district court's application of 29 U.S.C. Sec. 186. This issue is properly before the court. First, Kraftco, on appeal, attacked the premises on which the district court's section 302 conclusions rested--apparent authority, union ratification, and past dealings--and argued that no provision of federal labor law required setting aside the side agreement. Second, the union and pension fund have cited section 302 extensively as the basis for upholding the district court's order. Batson v. Kentucky, --- U.S. ---, 106 S.Ct. 1712, 1729, 90 L.Ed.2d 69 (1986) (Stevens, J., concurring) (issue is properly presented where "the party defending the judgment has explicitly rested on the issue in question as a controlling basis for affirmance.") Third, the panel's per curiam explicitly approved the district court's application of section 302. Under these circumstances, the propriety of applying section 302 is properly before the court
 
 
 [14]
 29 U.S.C. Sec. 186(c)(5) provides:
 The provisions of this section shall not be applicable ... (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): Provided, That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities.
 
 
 [15]
 Plaintiffs' remedy, as they seem to recognize, for Vestal's allegedly unauthorized behavior is set forth by Congress at 29 U.S.C. Sec. 501. Our conclusion, infra, that Vestal had apparent authority to enter into the letter agreement is not inconsistent with a finding that he lacked actual authority to so agree
 
 
 [16]
 Even if section 302 were applicable to this case, it appears that the requirements of the Sec. 302(c)(5) exception are met. Courts, of course, have required strict compliance with Sec. 302(c). Rosen v. Biscayne Yacht & Country Club, Inc., 766 F.2d 482, 484 (11th Cir.1985). The cases relied on by the district court dealt with oral modifications of an agreement which are clearly proscribed by Sec. 302(c)(5). Further, it is clear that the written agreement required by Sec. 302 need not be a collective bargaining agreement as long as it sets out the employer's obligation to contribute. Gariup v. Birchler Ceiling & Interior Co., 777 F.2d 370, 375 (7th Cir.1985); Hinson v. NLRB, 428 F.2d 133, 139 (8th Cir.1970); Doyle v. Shortman, 311 F.Supp. 187, 195 (S.D.N.Y.1970). The side letter construed with the collective bargaining agreement meets these standards
 Section 302(c)(5) also requires that the "detailed basis" on which payments will be made be specified in writing. The problem in this case arose precisely because the detailed basis was not provided in the agreement negotiated by the parties effective January 1, 1969. Article XII provided that Kraftco would contribute to the pension fund for each employee "upon his becoming a regular employee." The Fund now contends that "regular employee" is defined by Article I(B) which provides:
 New driver salesmen and plant maintenance personnel shall be on trial for a period of ninety (90) days from the date each such employee is placed on the payroll by the Employer, and during such period of ninety (90) days, they may be discharged without notice at the will of the Employer and without the benefit of any provision hereof with respect to discharge set forth in this contract; and other employees shall be on trial thirty (30) days from the date each such employee is placed on the payroll by the Employer, and during such thirty (30) day period they may be discharged without notice and at will of the Employer without the benefit of any provision hereof with respect to discharge set forth in this contract.
 The side letter arguably provided a more detailed basis than the collective bargaining agreement since the side letter specified when contributions would begin while the collective bargaining agreement referred to the term "regular employee," which could be defined by implication only.
 
 
 [17]
 We have recognized the effect of such letter agreements in the past, Capitol City Lumber Co. v. NLRB, 721 F.2d 546, 548-49 (6th Cir.1983), cert. denied, 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984), and nothing in the collective bargaining agreement in this case bars such agreements, Turner v. Local Union No. 302, Int'l Brotherhood of Teamsters, 604 F.2d 1219, 1226 (9th Cir.1979)
 
 
 [18]
 The record does not reveal any documentation of the ratification process. Accordingly, we are left with Dreaden's testimony as essentially the sole evidence on this issue
 
 
 [19]
 It is an unfair labor practice for either an employer or a union to insist on ratification when the parties have reached an otherwise binding agreement. NLRB v. Seneca Environmental Products, 646 F.2d 1170 (6th Cir.1981) (company); NLRB v. Electra-Food Machinery, Inc., 621 F.2d 956, 958 (9th Cir.1980) ("internal union matters, including the provision of a union's constitution, cannot relieve an employer from its bargaining duty or affect the validity of collective bargaining agreements"); NLRB v. Truckdrivers, Chauffeurs & Helpers, Local Union No. 100, 532 F.2d 569 (6th Cir.1976) (union; neither past practice nor union constitution put company on notice that ratification was a condition precedent to conclusion of binding collective bargaining agreement); NLRB v. International Union of Elevator Constructors, Local No. 8, 465 F.2d 974 (9th Cir.1972) (union); Houchens Market of Elizabethtown, Inc. v. NLRB, 375 F.2d 208 (6th Cir.1967)
 
 
 [20]
 Subsequent agreements of June 20, 1973, January 10, 1977, August 4, 1977, September 6, 1977, February 14, 1978 and March 28, 1980 dealt with the status of particular employees. A letter of August 15, 1977 agreed to bidding procedures and a letter of April 11, 1978 dealt with use of union transport drivers as relief drivers on non-union routes
 
 
 [21]
 Central States also argues that the letter agreement did not apply to similar provisions in the later-negotiated ice cream plant contract and in subsequent agreements of both milk plant and ice cream plant employees. The letter agreement, of course, was not an alteration or modification of the terms of the collective bargaining agreement, but merely a memorandum of understanding between the parties about the meaning of the term "regular" or "eligible" employee used in the labor contracts. As such, the overwhelming evidence at trial was that the letter applied to all agreements negotiated by the local with Kraftco. This view is supported by the fact that the union raised no objection to Kraftco's contribution practices although several new agreements were negotiated before this action was instituted. See Arizona Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Trust Fund v. Conquer Cartage Co., 753 F.2d 1512, 1520 n. 13 (9th Cir.1985)
 
 
 [22]
 Since we conclude that the district court erred in granting judgment in plaintiffs' favor, we need not address the alternative estoppel argument proffered by Kraftco
 
 
 [1]
 I also prefer to concur on the basis of the apparent authority rationale because under that theory one need only ascertain the intent of the parties making the side letter agreement and the record amply supports that the parties intended that the agreement was to continue unless and until changed. The ratification argument, on the other hand, implicates the troublesome question of whether the union membership was intending to ratify an amendment in perpetuity or only until the next negotiating session. The answer to this question is not ascertainable from the record