Ernest Leon **CUMMINGS,**
et al., Plaintiffs,

v.

**JOHN MORRELL & COMPANY, et al.,**
Defendants/Cross–Defendants/Appellees,

United Food and Commercial Workers International Union, AFL/CIO–CLC; United Food and Commercial Workers Local 242, Defendants/Cross–Plaintiffs/Appellants.

No. 93–5285.

United States Court of Appeals,
Sixth Circuit.

Argued April 29, 1994.

Decided Sept. 23, 1994.

George A. Joseph (argued and briefed), Kirkland & Ellis, Chicago, IL, for defendants-appellees.

Mark Allen, Agee, Allen, Godwin, Morris & Laurenzi, Memphis, TN, Harry Huge, Shea & Gould, Annette M. Capretta, Steven K. Hoffman (argued and briefed), Molly S. McUsic, Donovan, Leisure, Rogdvin Huge & Shiller, Richard B. Roesel, Washington, DC, for defendants-appellants.

Before: GUY and NELSON, Circuit Judges; and QUIST, District Judge.*

DAVID A. NELSON, Circuit Judge.

This is an appeal by a labor union from a summary judgment in favor of an employer that had been charged by the union with breach of a collective bargaining agreement. The union's claim was brought under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, a statute that has no explicit limitations period.

The question that we must decide is whether, as the union contends, the timeliness of the claim should be determined by reference to a state statute of limitations for cases analogous to this one, or whether, as the district court (Dowd, J.) determined on the strength of *DelCostello v. Int'l Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the timeliness of the claim should be determined by reference to the most closely analogous federal statute of limitations. We agree with the district court's answer to this question, and we shall affirm the summary judgment.

I

On July 12, 1979, John Morrell & Co., the defendant/cross-defendant in this case, entered into a collective bargaining agreement with the United Food and Commercial Workers Union, the defendant/cross-plaintiff. The agreement, which covered a three-year period beginning September 1, 1979, set forth terms and conditions of employment for UFCW members who worked at eleven Morrell meatpacking and distribution facilities.

Among the facilities subject to the agreement were the John Morrell plant at Memphis, Tennessee, and the Rodeo Meats plant at Arkansas City, Kansas. Approximately 600 workers were employed at Memphis, and some 800 were employed at Arkansas City.

The collective bargaining agreement set an average base wage of $10.69 per hour plus periodic cost-of-living increases. The agreement also guaranteed the employees specified paid holidays and vacations, medical coverage, pensions, and life insurance. Including the value of benefits, the package was worth an average of approximately $17 per hour for each employee.

Section 10 of the collective bargaining agreement, entitled "Management Rights," provided as follows:

"The Management of the plant and direction of the working force, including the right to hire, suspend or discharge for just cause, to assign to jobs, to transfer Employees within the plant, to increase and decrease the working force, to determine products to be handled, produced or manufactured, to establish schedules of production and the methods, processes and means of products or handling, is vested exclusively in the Company, *provided this will not be used* for the purpose of discrimination against any Employee or *to avoid any of the provisions of this Agreement, or any local agreement.*" (Emphasis supplied.)

The agreement set forth procedures to be followed in the event Morrell decided to close any of its plants. Before a plant closed, Morrell was required to give the union six months' notice and to provide severance pay and other benefits to the affected employees. The agreement required the payment of such benefits only in the event the plant closing was "permanent." A plant closing was considered "permanent" if, at the time the company closed the facility, it had no expectation of reopening it within two years.

In 1981 the management of Morrell sought wage concessions from the union prior to the

---

* The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

expiration of the 1979 collective bargaining agreement. When that demand was refused, the union charges, Morrell hatched a plan to achieve by subterfuge what it had been unable to achieve by negotiation. The essence of the plan, according to the union, was to close the Memphis and Arkansas City plants temporarily, terminate the employment of the bargaining-unit people who worked there, and later reopen the facilities under unilaterally-imposed terms and conditions outside the bounds of the collective bargaining agreement.

Pursuant to this plan, the union claims, Morrell closed the Arkansas City plant on June 19, 1982, and the Memphis plant on July 31, 1982, dismissing the unionized employees at those facilities. Morrell told the union and its employees that the closing was "permanent," and the employees were paid the severance benefits required under the collective bargaining agreement.

On March 23, 1983, Morrell reopened the Arkansas City meatpacking facility under the name "Ark City Packing Company"; in its new incarnation the Arkansas City facility offered an average base wage of $5.50 an hour and employed 200 workers. Morrell contended that the reopened Arkansas City factory was a "new plant," and that the wage rate set forth in the 1979 collective bargaining agreement no longer applied; moreover, Morrell claimed, the UFCW no longer represented the workers at the factory.

The union filed unfair labor practice charges with the National Labor Relations Board in response to the reopening of the Arkansas City plant. The NLRB conducted an investigation and informed the union of its intent to file a complaint against Morrell; shortly thereafter, at the NLRB's urging, Morrell and the union executed contracts covering both the Arkansas City plant and the Memphis plant, which Morrell had reopened in September 1983 as a putative "new plant."

On September 21, 1983, a class of former employees at the Arkansas City plant filed a hybrid breach of contact/breach of duty of fair representation suit against Morrell and the union. In that suit, *Aguinaga, et al. v. John Morrell & Company, et al.*, No. 83–1858 (D. Kan.), the plaintiffs charged Morrell with having broken the 1979 collective bargaining agreement by closing and then reopening the Arkansas City plant, and they charged the UFCW with having violated its duty of fairly representing the employees by agreeing to let Morrell reopen the Arkansas City plant without its being subject to the 1979 collective bargaining agreement.[1]

A virtually identical hybrid § 301/fair representation lawsuit was filed against Morrell and the union by former employees of the Memphis plant on January 25, 1984. This appeal is part of that proceeding.

In 1987 Morrell entered into a settlement with the former employees in the *Aguinaga* suit; in connection with the settlement, Morrell released documents as to which it had previously claimed attorney-client and work product privileges. After the union learned of these documents—which strongly indicated that Morrell never had intended to close the Memphis and Arkansas City plants permanently, but rather had planned to shut them down temporarily and then reopen them without union representation—the union filed an amended cross-claim against Morrell in the Memphis suit. Count one of the amended cross-claim charged Morrell with breach of § 10 of the 1979 collective bargaining agreement by temporarily closing the Memphis and Arkansas City facilities and discharging the employees at those plants with the specific intention of evading the obligations of the agreement. Count five demanded contribution or indemnification from Morrell for any amounts the union might become liable to pay its members for breach of the duty of fair representation.[2]

Again as a result of having received the previously confidential documents from Morrell, the union reinstituted an expanded ver-

---

1. The *Aguinaga* case was tried to a jury in April of 1988. The jury returned a verdict finding a breach of contract by Morrell and a breach of the duty of fair representation by the union.

2. The union later agreed to pay the former employees a sum of money in settlement of their fair representation claims against the union.

sion of its 1983 unfair labor practice charge. The new charge, filed with the NLRB on October 23, 1987, alleged that the reopening of the Arkansas City plant violated § 8 of the National Labor Relations Act. In 1991 a divided panel of the NLRB dismissed the charge on the ground that it was untimely under the six-month limitations period applicable to such charges. The Court of Appeals for the District of Columbia Circuit denied a petition by the union for review of the NLRB's decision. *UFCW v. NLRB*, 144 L.R.R.M. (BNA) 2743, 1993 WL 264414 (D.C.Cir.1993).

On December 18, 1992, the district court dismissed the union's breach of contract and contribution claims against Morrell.[3] Applying the six-month statute of limitations prescribed for unfair labor practice charges by § 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b), the district court held that the contract claim was time-barred. The union had urged the court to apply the Tennessee and Kansas statutes of limitations for breach of contract actions instead. (The Tennessee statute allows six years in which to bring such a claim; the Kansas statute, five years.) The district court rejected this suggestion, concluding that the union's claim for breach of the collective bargaining agreement was, in essence, an unfair labor practice charge, and that the policy of the federal labor laws would be undermined were the longer state statutes of limitations to be applied.

The court dismissed the union's claim for contribution or indemnification, explaining that in hybrid § 301/fair representation suits "liability is apportioned between the employer and the union according to the damage caused by the fault of each" (internal quotation marks omitted). Since both the union and Morrell were liable only for the damages each independently caused to the employees, the court reasoned, indemnification and contribution were not available to either party.

The union has perfected a timely appeal.

## II

When creating a new statutory cause of action, Congress sometimes fails to establish a specific period within which such claims must be brought. That happened here; § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, was enacted without a limitations provision.

When courts confront a federal cause of action that lacks an express statutory limitations period, they typically "borrow" an "appropriate" statute of limitations from someplace else. Whether an analogous statute of limitations is selected from state law or from federal law, and under what circumstances either choice is appropriate, are subjects that the Supreme Court has visited several times over the past three decades.

In *UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966), the Court was faced with the question of which limitations period to apply to a straight § 301 claim brought by a union against an employer for an alleged failure to pay for vacations as required by a collective bargaining agreement. On its facts, the Court noted, the union's suit against Hoosier Cardinal was "essentially an action for damages caused by an alleged breach of an employer's obligation embodied in a collective bargaining agreement." *Id.* at 705 n. 7, 86 S.Ct. at 1113 n. 7. The case involved neither the formation of a collective bargaining agreement through a process of negotiation, nor a question of private settlement of disputes arising under an agreement. *Id.* at 701–02, 86 S.Ct. at 1111. Rather, the suit called for an interpretation of a contract made by the parties, and an examination of the employer's conduct, to determine whether the employer had fulfilled its obligations.

Historically, the Court noted, when Congress declines to provide a limitations period for a federal cause of action, the courts apply limitations periods from state law. "As early as 1830," the Court observed, it had been "held that state statutes of limitations govern the timeliness of federal causes of action unless Congress has specifically provided otherwise." *Id.* at 703–04, 86 S.Ct. at 1112 (citing *McCluny v. Silliman*, 3 Pet. 270, 277, 7 L.Ed. 676 (1830)). In view of that long-

---

**3.** The union's other cross-claims against Morrell had been dismissed earlier.

standing practice, the Court said it was likely that Congress, in omitting a statutory limitations period, intended a state statute of limitations to be used. To borrow a limitations period from a different federal statute to govern all actions brought under § 301 (as suggested by one of the parties) would thus be "drastic ... judicial legislation." *Id.* at 703, 86 S.Ct. at 1112.

The *Hoosier Cardinal* Court had been urged by the plaintiff union to impose a single federal statute of limitations for all actions brought under § 301. Borrowing a single limitations period from elsewhere in federal law, the union asserted, would promote uniformity of outcome in such suits; otherwise, similar cases might come to different outcomes depending upon which state statute a given federal court saw fit to use as the source of a limitation period. The Court, however, did not see uniformity as sufficiently important to override Congress' implied intent that state limitation periods be used. In labor cases, Justice Stewart wrote for the Court,

> "[t]he need for uniformity ... is greatest where its absence would threaten the smooth functioning of those consensual processes that federal labor law is chiefly designed to promote—the formation of the collective agreement and the private settlement of disputes under it. For the most part, statutes of limitations come into play only when these processes have already broken down. Lack of uniformity in this area is therefore unlikely to frustrate in any important way the achievement of any significant goal of labor policy." *Id.* at 702, 86 S.Ct. at 1111.

Since the case involved neither the formation of a collective bargaining agreement nor the private settlement of a dispute under the agreement, uniformity was not a factor of special weight.

The question of which limitations period to apply to a § 301 suit was addressed again in *United Parcel Service v. Mitchell,* 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981). *Mitchell,* unlike *Hoosier Cardinal,* was a hy-

brid suit in which the employer was charged with violation of a collective bargaining agreement and the union was charged with breach of the duty of fair representation. Although a majority of the Court concerned itself with which state statute of limitations to apply, Justice Stewart, concurring in the result, argued that a uniform limitations period borrowed from § 10(b) of the National Labor Relations Act should apply in hybrid suits.[4] *Hoosier Cardinal,* Justice Stewart explained, did not lay down a hard and fast rule that state statutes of limitations always apply where Congress has been silent; instead it outlined those situations in which it was appropriate to infer a congressional intent that state statutes be so used. Hybrid lawsuits, by definition, involve two separate claims—one against the employer and one against the union. The employee's claim against his union, Justice Stewart wrote, was exclusively a creature of federal law and bore no particular resemblance to claims existing under state law—unlike the half of the employee's claim alleging breach of the collective bargaining agreement. Moreover, he noted, a claim that a union has violated its duty of fair representation generally, if not always, constitutes a claim of an unfair labor practice under the National Labor Relations Act. The NLRA, in turn, has an express statute of limitations—§ 10(b)—which gives an employee six months to sue over an unfair labor practice. Since at least half of the employee's lawsuit would be similar to an unfair labor practice claim, and since it would be impractical to apply different statutes of limitations to different elements of a single cause of action, an exception to the *Hoosier Cardinal* principle should be established for hybrid § 301 fair representation suits. *Mitchell,* 451 U.S. at 66–71, 101 S.Ct. at 1566–68 (Stewart, J., concurring).

In *DelCostello v. Int'l Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the full Court accepted Justice Stewart's reasoning in *Mitchell* and held that hybrid § 301/fair representation suits are subject to the limitations period of

---

4. The majority of the justices in *Mitchell* did not consider whether the use of a federal statute of limitations was appropriate in hybrid suits, this question not having been raised in the petition for certiorari.

**504**

§ 10(b) of the NLRA. The Court stressed the similarity between a hybrid suit and an unfair labor practice claim, stating that "[t]he NLRB has consistently held that all breaches of a union's duty of fair representation are in fact unfair labor practices." *Id.* at 170, 103 S.Ct. at 2293. Moreover, the claim in *DelCostello* implicated the central focus of federal labor law: "those consensual processes that federal labor law is chiefly designed to promote—the formation of the agreement and the private settlement of disputes under it." *DelCostello,* 462 U.S. at 171, 103 S.Ct. at 2294 (quoting *Mitchell,* 451 U.S. at 70, 101 S.Ct. at 1568 (Stewart, J., concurring)). Congress having already struck "the proper balance between the national interests in stable bargaining relationships and finality of private settlements, and an employee's interest in setting aside what he views as an unjust settlement under the collective-bargaining system" in establishing a limitations period for unfair labor practice claims, it was reasonable, the Court held, to conclude that Congress would want a similar limitations period to apply to substantially equivalent claims raised under § 301. *Id.* (quoting *Mitchell,* 451 U.S. at 70, 101 S.Ct. at 1568 (Stewart, J., concurring)).

The *DelCostello* Court emphasized, however, that its

> "holding ... should not be taken as a departure from prior practice in borrowing limitations periods for federal causes of action, in labor law or elsewhere. We do not mean to suggest that federal courts should eschew use of state limitations periods anytime state law fails to provide a perfect analogy." *Id.*

Rather, a rule from elsewhere in federal law should be borrowed only where it "clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking." *Id.* at 172, 103 S.Ct. at 2294.

All three criteria were met in *DelCostello.* Federal law clearly provided a closer analogy to draw upon than did state law, since the hybrid § 301/fair representation claim involved two very different elements, one of which had no counterpart in state law. The federal policies at stake—the promotion of private dispute resolution under collective bargaining agreements through grievance and arbitration processes—were exactly those protected and promoted by the Act of which § 10(b) was a part. The practicalities of litigation made the federal statute of limitations significantly more appropriate, because the state statutes of limitation offered as alternatives afforded workers an insufficient period of time in which to prepare and file their claims.

Summing up the *Hoosier Cardinal, Mitchell,* and *DelCostello* trilogy in *Reed v. United Transportation Union,* 488 U.S. 319, 324, 109 S.Ct. 621, 625, 102 L.Ed.2d 665 (1989), the court called *DelCostello* a "closely circumscribed exception" and "a narrow exception" to "the general rule that statutes of limitation are to be borrowed from state law." Rather than opening the door to generalized browsing through the United States Code for a statute of limitations to apply where Congress has chosen to remain silent, the Court said *DelCostello* made clear that "application of a federal statute will be unusual, and 'resort to state law remains the norm for borrowing of limitations periods.'" *Id.* (quoting *DelCostello,* 462 U.S. at 171, 103 S.Ct. at 2294). The Court "admoni[shed]" observers to "take seriously" the rule that "analogous state statutes of limitations are to be used unless they frustrate or significantly interfere with federal policies." *Id.* at 327, 109 S.Ct. at 627.

### III

We have had occasion in the past to consider which statute of limitations to apply in various cases arising under the federal labor laws where the substantive statute in question was silent as to a limitations period. Consistent with the "admonition" of the *Hoosier Cardinal* trilogy, we generally have applied state statutes of limitations to § 301 suits not of the "hybrid" variety.

The landmark case is *Central States Southeast & Southwest Areas Pension Fund v. Kraftco, Inc.,* 799 F.2d 1098 (6th Cir.1986) (en banc), *cert. denied,* 479 U.S. 1086, 107

S.Ct. 1291, 94 L.Ed.2d 147 (1987). In *Kraft-co* a union-sponsored pension fund sued an employer under § 301 of the LMRA, claiming that the employer had broken a collective bargaining agreement by failing to make required payments into a pension fund. In considering whether a state or federal statute of limitations was most closely analogous, we found it necessary to characterize the plaintiff's claim by examining "the elements of the cause of action" established by Congress. *Id.* at 1105. Although the employer attempted to portray the union's claim as substantially the same as an unfair labor practice claim, we determined that the union's cause of action was essentially equivalent to a state breach of contract suit. We noted that the claim related solely to the employer's failure to abide by the terms of the labor contract it had signed, and neither contract negotiation nor the grievance process was implicated. In sum, the issues in *Kraftco* boiled down to what the contract said and whether the employer discharged its duties under it. These issues could "be decided by reference to principles of contract and agency law apart from the federal statutes that procedurally give rise to these claims and our jurisdiction." *Id.* at 1106. We therefore held that Tennessee's statute of limitations for written contracts should be applied. *Id.* at 1108. Because the cause of action asserted in *Kraftco* implicated neither the "system of industrial self-government" nor the "law of the shop" that Justice Stewart described in *Mitchell* and *Hoosier Cardinal,* we determined that use of a state statute of limitations would not be inconsistent with federal labor policy and that *DelCostello* accordingly did not compel application of the § 10(b) limitations period. *Id.* at 1107.[5]

On a few occasions, we have invoked the "closely circumscribed exception" of *DelCostello* and held the § 10(b) limitations period applicable to claims asserted solely under § 301 of the LMRA. In *McCreedy v. Local 971, UAW,* 809 F.2d 1232 (6th Cir.1987), a suit seeking to compel an employer to submit

to arbitration under a collective bargaining agreement, was one such case. We noted that "an action to compel arbitration is not readily analogous to a traditional breach of contract suit where damages are sought" and that no state statute of limitations appeared to offer an appropriate analogy. *Id.* at 1238. A union action to compel arbitration is a "creature of [federal] labor law," we observed, like the employee's breach of duty of fair representation claim in *DelCostello.* *Id.* We followed *DelCostello* and applied the federal statute of limitations because of the lack of an appropriate state law analogy, because the cause of action at issue was a creature of federal labor law, and because we saw the claim as implicating the important federal policy goal of promoting the swift private settlement of disputes under collective bargaining agreements through arbitration. *Id.* at 1237.

We also applied the § 10(b) statute of limitations to a straight § 301 claim in *Woosley v. Avco Corp.,* 944 F.2d 313 (6th Cir.1991). That case involved the claims of individual employees to entitlement to a particular type of job under a collective bargaining agreement. The question was subject to resolution through the grievance mechanism of a collective bargaining agreement. We applied the federal statute of limitations (1) to promote the federal policy of resolving collective bargaining disputes through grievance and arbitration, and (2) because the suit "involve[d] day-to-day employment ... issues" pitting individual employees against the employer. *Id.* at 318. Section 10(b) was an appropriate choice as a statute of limitations because the issue involved "law of the shop" considerations important to federal labor law. See *DelCostello,* 462 U.S. at 168–69, 103 S.Ct. at 2293.

## IV

■ In the case at bar the parties agree that our choice lies between the six-month limitations period set forth in § 10(b) of the

5. Other cases where we applied state statutes of limitations to straight § 301 claims include *Apponi v. Sunshine Biscuits, Inc.,* 809 F.2d 1210, 1216 (6th Cir.), *cert. denied,* 484 U.S. 820, 108 S.Ct. 77, 98 L.Ed.2d 40 (1987); *UAW Local 1298 v.* *Zeller Corp.,* No. 86–3326, 1987 WL 36052 (6th Cir. May 15, 1987) (per curiam); and *Carruthers Ready–Mix, Inc. v. Cement Masons Local Union No. 520,* 779 F.2d 320, 327 (6th Cir.1985).

LMRA and the six-year Tennessee and five-year Kansas limitations periods for actions for breach of contract. The parties apparently agree, further, that the union's claim for breach of the collective bargaining agreement will be time-barred if the § 10(b) limitations period is applied, and that the action will not be so barred if a state statute is used.

On *de novo* review, we conclude that the federal statute of limitations provides a better fit. The facts of this case implicate federal labor policy to such a degree that this case falls within the "closely circumscribed exception" to the rule favoring state statutes of limitations. *Reed,* 488 U.S. at 324, 109 S.Ct. at 625.

We should decline to borrow a state statute of limitations only "when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking." *Id.* (quoting *DelCostello,* 462 U.S. at 172, 103 S.Ct. at 2294). As is apparent from the Supreme Court's phrasing of this test, each of three elements must be satisfied for us to depart from the "norm" of borrowing a state limitations period. *Reed,* 488 U.S. at 324, 109 S.Ct. at 625. Here, it appears to us, all three of these considerations favor application of § 10(b).

First, the union's claim bears a strong family resemblance to an unfair labor practice charge. The union's own conduct supports this observation, because the union filed an unfair labor practice complaint with the NLRB concerning the shutdown of the Memphis and Arkansas City factories. The fact that the union did not prevail on the NLRB charge is of slight significance to our analysis. *DelCostello* teaches that a claim need not be identical to an unfair labor charge for the § 10(b) limitation to apply; a close resemblance (along with the presence of additional factors) can be sufficient. *DelCostello,* 462 U.S. at 158 n. 12, 172, 103 S.Ct. at 2288 n. 12, 2294. On the other hand, the claim presented here by the union is quite dissimilar to the claims advanced in *Hoosier Cardinal* and *Kraftco,* for example, both of

which involved the performance of a discrete contractual obligation. Resolution of the instant claim will require a plumbing of the entire union-management relationship over a period of many months.

The second branch of the *DelCostello* analysis also favors use of the § 10(b) limitations period. Application of the state statutes, we believe, would pose a threat of "frustrat[ing] or significantly interfer[ing] with federal policies." *Reed,* 488 U.S. at 327, 109 S.Ct. at 627. A cardinal goal of federal labor law is the protection and promotion of "consensual processes" of labor-management interaction. Most significantly, federal law favors collective bargaining as a means by which workers and employers define the terms of their relationship. See *Hoosier Cardinal,* 383 U.S. at 702, 86 S.Ct. at 1111 ("federal labor law is chiefly designed to promote ... the formation of the collective [bargaining] agreement"). Collective bargaining is sufficiently important that federal policy favors the swift resolution of claims touching upon its integrity. See *Reed,* 488 U.S. at 329, 109 S.Ct. at 628.

In this case the union's claim rests, in large part, on the conduct of collective bargaining between the parties. The union and Morrell began negotiating over modification of the 1979 agreement in mid–1981, and near the end of that year they began to bargain over a new agreement to take effect upon the expiration of the 1979 contract. The union alleges that Morrell's conduct throughout these negotiations was part of a "fraudulent plan" culminating in the closure of the Memphis and Arkansas City plants in June and July of 1982, and in the subsequent negotiation of a new collective bargaining agreement excluding those facilities from coverage. Morrell's prevarications about its intent in closing the plants, the union says, led it to agree to the exclusion of the factories from the new contract, and much of its proof of this claim presumably would involve evidence of the employer's statements and conduct during the talks. Such an attack on the integrity of the bargaining process, we think, is required by federal labor policy to be resolved quickly—much as charges of unfair labor practices are—and § 10(b) is an appropriate vehicle to serve this interest. See

*Mitchell,* 451 U.S. at 67–68, 101 S.Ct. at 1566–67 (Stewart, J., concurring) ("§ 10(b) of the NLRA was designed ... to safeguard the stability of collective-bargaining agreements").

It is significant that the once-closed plants at issue here have been the subject of at least two collective-bargaining agreements in the time since they reopened. Under these circumstances, five or six years is simply too long a time to let a labor dispute fester. Application of a state limitations period in such a situation, effectively allowing the reopening of a long-concluded negotiation, could (as the employer argues) interfere with the entire labor relationship that subsequently developed at those facilities.

In *Woosley,* we stated that application of the § 10(b) statute of limitations is appropriate where a § 301 suit relates to "entitlement [to] employment." 944 F.2d at 318. This case is all about entitlement to employment—the union alleges that the closing of the factories wrongfully deprived its members of an entitlement to be employed under the terms of the 1979 contract, and claims that this deprivation resulted in damages to the union in the form of lost dues payments.

By contrast, our *Kraftco* case (where we applied a state limitations provision) did not involve a claim of entitlement to employment at all. It was, instead, a pension dispute in which the plaintiffs claimed that the employer had failed to pay the proper amounts of money into a retirement fund. 799 F.2d at 1100.

Finally, the "practicalities of litigation" do not favor the use of a longer state limitations period here. In *DelCostello* the Supreme Court warned about the dangers of requiring unsophisticated workers to gather information about an event and file a lawsuit within a narrow time frame. 462 U.S. at 165–66, 103 S.Ct. at 2291. Here, however, we are presented with a sophisticated claimant that is an experienced litigator. It works no unfairness against such a party to impose a six-month time limit on the bringing of a claim such as this one.

## V

Count five of the union's cross-claim against Morrell seeks contribution or indemnification for the union's settlement of its members' hybrid § 301 claim. The district court dismissed this count, finding that contribution or indemnification is not available for damages paid as a result of a hybrid § 301 claim.

The liability of a union and an employer on a hybrid § 301/fair representation claim extends only to the amount of damages each independently caused. *Vaca v. Sipes,* 386 U.S. 171, 197–98, 87 S.Ct. 903, 920–21, 17 L.Ed.2d 842 (1967). As a general rule, there is no joint and several liability for such damages. *Id.* Since the union was responsible only for damages it itself caused, we think that its settlement with its members can only be said to have discharged its individual liability, and not that of Morrell. The union has cited no cases holding that a contribution or indemnification claim is available in this context, and we think that the district court's reasoning in dismissing count five of the union's cross-claim was sound.

**AFFIRMED.**