NOT RECOMMENDED FOR PUBLICATION
File Name: 13a0965n.06

No. 12-2630

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

LOCAL UNION 2-2000 UNITED STEEL, PAPER )
A N D   F O R E S T R Y ,   R U B B E R , )
MANUFACTURING, ENERGY, ALLIED- )
INDUSTRIAL, CHEMICAL AND SERVICE )
WORKERS INTERNATIONAL UNION; UNITED )
STEEL, PAPER AND FORESTRY, RUBBER, )
MANUFACTURING, ENERGY, ALLIED- )
INDUSTRIAL, CHEMICAL AND SERVICE )
WORKERS INTERNATIONAL UNION )
  )
    Plaintiffs-Appellees, )
  )
v. )
  )
COCA-COLA REFRESHMENTS USA, INC., )
  )
    Defendant-Appellant. )

> **FILED**
> NOV 8, 2013
> DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF
MICHIGAN

OPINION

Before: ROGERS and DONALD, Circuit Judges; ANDERSON, District Judge.[*]

**BERNICE BOUIE DONALD, Circuit Judge.**  Plaintiff unions sued employer Coca-Cola

for breach of their collective bargaining agreement, claiming that Coca-Cola failed to fulfill its

obligation to implement certain wage increases on the agreed-upon dates.  The parties filed cross-

motions for summary judgment, offering competing interpretations of the collective bargaining

agreement.  Coca-Cola also moved for summary judgment on grounds that the unions' action was

---

[*]The Honorable S. Thomas Anderson, United States District Judge for the Western District
of Tennessee, sitting by designation.

time-barred. The district court granted summary judgment in favor of the unions, and Coca-Cola

appeals the judgment. For the following reasons, we **AFFIRM** the judgment of the district court.

I.

Plaintiffs, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-

Industrial and Service Workers International Union, AFL-CIO-CLC ("USW") and its local union

affiliate, Local 2-2000, were parties to a collective bargaining agreement ("CBA") with Defendant

Coca-Cola that governed Coca-Cola's Paw Paw, Michigan facility from March 25, 2006 to

September 30, 2009. In September 2009, the parties engaged in extensive negotiations over an

agreement to replace the 2006 CBA. The negotiations resulted in an agreement to the following

wage increases:

> Year 1: 0% increase
>
> Year 2: 2% increase
>
> Year 3: 3% increase

The specific effective dates for these increases were not discussed in the negotiations.

This agreement was documented in a Tentative Settlement Agreement ("TA") by an officer

of Coca-Cola on September 28, 2009. The TA provided for an agreement duration from October

1, 2009 through September 30, 2012, with all terms of the prior CBA to remain in effect "except as

modified herein." The TA further provided for three increases in fringe benefits, effective May 2,

2010; May 1, 2011; and May 6, 2012. The TA also provided for two Retirement Plan increases,

effective March 25, 2010 and March 25, 2011, and three "sick and accident insurance" increases, effective April 1, 2010; April 1, 2011; and April 1, 2012.

The TA was signed by Coca-Cola and union officials the same day, signifying that a deal had been reached subject to ratification by the local union's membership. Coca-Cola's labor relations manager prepared a red-lined document for the local union, highlighting the changes from the prior CBA. This document had an Appendix A, which provided the graduated rate increases as follows:

Year 1:      0% increase

Year 2:      2.0 % increase

Year 3:      3.0 % increase

Appendix A did not specify the effective dates or wage rates. The local union membership reviewed the red-lined document and voted to ratify the agreement on September 30, 2009. Coca-Cola then presented a draft based on the red-lined document to the local union for proofreading. The union returned the draft to the company with very minor corrections.

At some point after the effective date of the agreement, Coca-Cola prepared a chart titled "Appendix A" which listed March 21, 2010; March 20, 2011; and March 25, 2012 as the effective dates for the agreed-upon wage increases, to align with the March wage increase dates in the previous CBA.

Local union negotiators signed signature pages supplied by the company with the understanding that Coca-Cola would attach them to the corrected final CBA draft. Coca-Cola

appended the various signature pages to a corrected draft and forwarded this to the parent union for signature. The parent union representative, after a cursory review and with the assumption that the local union had thoroughly proofread the final draft, obtained the necessary signatures.

Coca-Cola had the executed agreement printed in booklet form, and the local union distributed that booklet to its employees on July 17, 2010, over six months after the effective date of the agreement. It was greeted with "immediate protests" in response to the inclusion of the modified "Appendix A." The local union president emailed the plant general manager, indicating that a "mistake has been found . . . in Appendix A which has to do with our wage increase." Coca-Cola proceeded with the wage increases according to the Appendix A it had drafted, and declined to arbitrate the matter.

The local union filed suit for breach of contract on March 23, 2011, and the parent union joined in the amended complaint filed January 3, 2012. The parties filed cross-motions for summary judgment. The district court granted summary judgment in favor of the unions. Coca-Cola timely filed the present appeal.

## II.

The amended complaint's sole cause of action against Coca-Cola is breach of the CBA. The district court had jurisdiction under § 301 of the Labor Management Relations Act (LMRA), which grants federal court jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a).

Coca-Cola argues both that the unions' action was time-barred and that the district court erred when it reformed the wage increases provision of the agreement under the doctrine of mutual mistake of fact to grant summary judgment to the unions. We address these arguments in turn, applying a de novo standard of review. *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) ("We review de novo a district court's grant of summary judgment.").

A.

Because the LMRA does not set a specific limitations period, federal courts must apply the most closely analogous state statute of limitations. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW), AFL-CIO v. Hoosier Cardinal Corp.*, 383 U.S. 696, 703-04 (1966). Coca-Cola argues that the six-month limitation period contained in § 10(b) of the National Labor Relations Act (NLRA), 29 U.S.C. § 160(b), applies to this case because, while presented as a LMRA-based "breach of contract" action, the claim is actually more analogous to an unfair labor practice claim.

The company asserts that, because the unions became aware of the contractual dispute at issue in July 2010 but only filed suit in March 2011, their claims are outside of the six-month limitations period and are therefore time-barred. Coca Cola asserts that the local union's filing of an unfair labor practice charge based on the same subject matter as the amended complaint amounts to a concession that § 10(b) of the NLRA applies.

The unions counter that their suit was timely filed within Michigan's six-year limitations period for contract actions applicable to LMRA § 301 actions to recover wages under the terms of a CBA. The unions emphasize that the parties agree that the controversy before the court is a matter of contract interpretation as to whether Coca-Cola discharged its duties under the 2009 CBA. The unions point out that many, if not most, unilateral failures to meet CBA obligations result in both an unfair labor practice charge before the National Labor Relations Board and a breach of contract suit in district court. Finally, the unions argue that even if the NLRA six-month statute of limitations were applied here, their action is not time-barred.

For support of its statute of limitations argument, Coca-Cola relies primarily upon *Cummings v. John Morrell & Co.*, 36 F.3d 499 (6th Cir. 1994), whereas the unions look to the holdings in *UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696 (1966), and *Central States Southeast & Southwest Areas Pension Fund v. Kraftco, Inc.*, 799 F.2d 1098 (6th Cir. 1986) (en banc). We will look to *Cummings*—which analyzed both *Kraftco* and *Hoosier*—for guidance in determining whether to apply the six-month limitations period set forth in § 10(b) of the NLRA or Michigan's six-year statute of limitations for breach of contract actions.

The *Cummings* court acknowledged Supreme Court precedent from *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151 (1983), establishing that "hybrid" suits combining § 301 and fair representation claims are subject to the abbreviated limitations period of § 10(b) "since it would be impractical to apply different statutes of limitations to different elements

of a single cause of action."[1]  36 F.3d  at 503-04 (citing *DelCostello*, 462 U.S. at 170-71).  The

hybrid characteristic distinguished this line of cases from the earlier *Hoosier* decision which applied

the state statute of limitations.  *Id.* at 502.  Because the gravamen of the complaint was "essentially

an action for damages caused by an alleged breach on an employer's obligation embodied in a

collective bargaining agreement," the *Hoosier* court applied the applicable state statute of limitations

for breach of contract.  383 U.S. at 696, 705 n.7.

Although *DelCostello* held that hybrid complaints are subject to the NLRA limitations

period, it made clear that application of a federal statute of limitations will only be appropriate in

unusual cases, and "resort[ing] to state law remains the norm for borrowing of limitations periods."

462 U.S. at 171.  The Supreme Court underscored this point several years later in *Reed v. United*

*Transportation Union*, 488 U.S. 319 (1989), when it called *DelCostello* a "closely circumscribed

exception" to "the general rule that statutes of limitation are to be borrowed from state law."  *Id.* at

324.

*Cummings* also examined our en banc decision in *Kraftco*, in which a union-sponsored

pension fund sued an employer under the LMRA, alleging that the employer violated the terms of

a CBA by failing to make required payments into the pension fund.  36 F.3d at 505.  Although the

employer attempted to portray the claim as substantially similar to an unfair labor practices claim,

---

[1]The local union originally filed this action as a hybrid case, suing the parent union for unfair representation and Coca-Cola for breach of the CBA.  (PageID 1-2.)  The two unions then jointly filed an amended complaint against Coca-Cola for breach of contract.  (PageID 228.)  The parent union was removed as defendant.  (PageID 228-29.)

we held that it was closer to a breach of contract action: "[T]he issues in *Kraftco* boiled down to what the contract said and whether the employer discharged its duties under it." *Id.* (citing *Kraftco*, 799 F.2d at 1108). The court, therefore, held that the state statute of limitations should be applied. *Id.*

Finally, *Cummings* examined two non-hybrid cases where we invoked the "closely circumscribed exception" of *DelCostello* to hold that the § 10(b) limitations period applied to claims brought under the LMRA. In *McCreedy v. Local 971, UAW,* 809 F.2d 1232 (6th Cir. 1987), involving an action seeking to compel an employer to submit to arbitration, we held that "an action to compel arbitration is not readily analogous to a traditional breach of contract suit where damages are sought." *Id.* at 1238. Such an action, which "seeks only to enforce the grievance and arbitration procedures" under the CBA is, like an employee's unfair representation claim, "a creature of labor law." *Id.* The second case, *Woosley v. Avco Corp.*, 944 F.2d 313 (6th Cir. 1991), addressed the claims of individual employees to entitlement to a particular job under a CBA; we applied the § 10(b) time period because the case involved "day-to-day employment and grievance issues" and "collective bargaining processes [that] might be disturbed." *Id.* at 318.

Armed with this wealth of case law, the *Cummings* court applied a three-element test adapted from the Supreme Court's decision in *DelCostello*, looking at (1) whether federal law clearly provides a closer analogy than available state statutes, (2) whether the importation of state law would frustrate or interfere with the implementation of national policies, and (3) the "practicalities of litigation." *Cummings*, 36 F.3d at 506. The court found that the union's claim bore a "strong

family resemblance" to an unfair labor practice charge because the union filed such a charge with

the NLRB concerning the same employer conduct at issue in the complaint. *Id.* The court further

found that, because the claim rested on the conduct of collective bargaining between the parties and

federal law favors collective bargaining, application of the state statutes would frustrate or interfere

with federal policies. *Id.* The court also emphasized that, under our precedents, application of the

§10(b) statute of limitations is appropriate where a § 301 suit relates to entitlement to employment.

*Id.* at 507. Finally, because the union was a sophisticated claimant, it would work "no unfairness

against such a party to impose a six-month time limit." *Id.* Consequently, the court concluded that

the practicalities of litigation did not favor the use of a longer state limitations period. *Id.*

Coca-Cola argues that, like *Cummings*, the union in this case filed an unfair labor practices

complaint with the NLRB regarding the same subject matter, and this case, like *Cummings*, rests

in large part "on the conduct of collective bargaining between the parties." *Id.* at 506. These

similarities are superficial, however, in contrast to what matters most: the nature of the claim and

whether it is more closely analogous to a state law breach of contract or a federal labor law claim.

The unions' amended complaint does not assert that Coca-Cola engaged in unfair dealings

in the aftermath of the CBA negotiations. Instead, the unions claim that the terms of the 2009 CBA

obligated Coca-Cola to implement a 2% wage increase on October 1, 2010 and a 3% wage increase

on October 1, 2011, and that Coca-Cola, by repudiating the terms of the agreement, was liable for

damages for breach of contract. Thus the sole claim in this case is most analogous to *Hoosier*,

*Kraftco*, and a state law claim for breach of contract. *Hoosier* addressed a claim that the employer

breached a CBA by terminating the employment of employees without paying them accumulated vacation pay as provided in the agreement. 383 U.S. at 698. *Kraftco* dealt with a union's failure to make payments into a pension plan as provided in a CBA. 799 F.2d at 1100. The unions' very similar claim here is that Coca-Cola breached the CBA by failing to provide wage increases at the appropriate time.

The local union's filing of an unfair labor practice charge and initial filing a hybrid complaint suing the parent union as well as Coca-Cola does not make this an appeal of a hybrid case. The en banc court's reasoning in *Kraftco* supports this conclusion. Here, as in *Kraftco*, the amended complaint "did not allege a breach of the duty of fair representation . . . ." *Id.* at 1106. The duty of fair representation "has primarily been associated with contract negotiation and the enforcement of that contract through grievance processing." *Id.* (quoting *NLRB v. Local 299, Int'l B'hood of Teamsters*, 782 F.2d 46, 50 (6th Cir. 1986)) (internal quotation marks omitted). That duty is "implicated only when an individual or group is treated differently by a union than another individual, group, or the collective." *Id.* (quoting *Local 299*, 782 F.2d at 51-52) (internal quotation marks and alterations omitted). No allegations in the second amended complaint implicate this duty, so applying the Michigan six-year limitations period will not frustrate or interfere with the implementation of federal labor law policies. *See Cummings*, 36 F.3d at 506. Furthermore, as all the parties are sophisticated litigants, the "practicalities of litigation" do not favor the choice of one statute of limitations over the other. *See id.* at 507.

Accordingly, this is a breach of contract claim governed by Michigan's six-year statute of limitations. Because the CBA took effect on September 30, 2009 and the local union filed suit on March 23, 2011, the action was timely filed.

B.

We now turn to the merits question of whether the district court erred when it reformed the contract under the doctrine of mutual mistake and granted summary judgment to the unions. The unions argue that the CBA unambiguously provided for effective dates for the wage increases of October 1, 2010 and October 1, 2011 in its "Year 1," "Year 2, " "Year 3" terminology. They contend that a wage freeze went into effect on the effective date of the agreement and lasted for the entire "Year 1" of the three-year agreement term. Accordingly, the two increases were intended by the parties to go into effect on day one of "Year 2 " and "Year 3," respectively. The unions assert that the CBA was—in contrast—explicit where the parties intended mid-contract year effective dates, as they did with the fringe benefits, and that lack of specificity on this issue in the TA supports the union's common-sense reading of the contract. The unions conclude that Coca-Cola should not be allowed to profit from their own mistake in the drafting of the agreement and that the court should reform the agreement to reflect the intent of the parties.

Coca-Cola counters that the language of the final, signed agreement, which includes the company-drafted Appendix A, unambiguously provides for March wage increase dates and that, without clear and convincing evidence of mutual mistake, this language must govern the contractual

relations of the parties. The company argues that because the four corners of the properly executed contract unambiguously provide for March dates, our inquiry should proceed no further.

While parol evidence is inadmissible to show additional terms, such evidence is always admissible to show that there has been a mistake in reducing the agreement of the parties to writing as grounds for seeking reformation of a contract. *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1295 (6th Cir. 1991); RESTATEMENT (SECOND) OF CONTRACTS §214(e) (1981). Additionally, the courts have the power to reform a contract to make it conform to the agreement the parties actually made. *Casey v. Auto Owners Ins. Co.*, 729 N.W.2d 277, 284-85 (Mich. Ct. App. 2006). To obtain reformation of a contract, the plaintiff must prove a mutual mistake of fact by clear and convincing evidence. *Id.* The showing of a unilateral mistake is not sufficient to obtain reformation. *Id.* Because the plaintiffs have shown that the parent union did not closely review the amended Appendix A we may look to the agreement ratified by the union in order to determine that actual intent of the parties.

The only factual support for Coca-Cola's position is that the prior agreement commenced in March of 2006, and, thus, its wage increases took effect in March of each relevant year. This argument is a double-edged sword, however, for another, and perhaps more, sensible interpretation of the 2006 CBA's relevance is that the initial 0% wage increase of the 2009 CBA should take effect, just as it did in 2006, on the effective date of the agreement, with successive increases taking effect on the respective anniversaries of the agreement.

As the unions contend, the "Year 1," "Year 2, " "Year 3" language of the agreement, the specific dates provided for other elements of the CBA, and the lack of evidence that the March dates were ever contemplated by the negotiating parties support this interpretation. These facts further support the conclusion that this dispute was not a matter of the unions simply misunderstanding what they were bargaining for but was rather a mutual mistake of the parties: a mistake on the part of Coca-Cola in failing to embody in the writing the actual agreement reached and a mistake on the part of the unions in not identifying this error before executing the agreement. When "terms are used in or omitted from the instrument which give it a legal effect not intended by the parties, . . . equity will always grant relief unless barred on some other ground, by correcting the mistake so as to produce a conformity of the instrument to the agreement." *Johnson Family Ltd. P'ship v. White Pine Wireless, LLC*, 761 N.W.2d 353, 363 (Mich. Ct. App. 2008) (quoting *Schmalzriedt v. Titsworth*, 9 N.W.2d 24, 28 (Mich. 1943)) (internal quotation marks omitted).

## III.

The district court thus correctly determined that "[t]he record, viewed as a whole, . . . indicates that the parties intended to establish wage increases concomitant with the CBA anniversaries, and that the resulting document does not adequately reflect their agreement." Accordingly, we **AFFIRM** the district court's grant of summary judgment.

**S. THOMAS ANDERSON**, District Judge, concurring in part and dissenting in part,

While I concur with the majority's opinion on the statute of limitations issue, I write separately to state my disagreement with the majority's holding on the contract issues. There is simply a lack of clear and convincing evidence that a mutual mistake occurred when Coca-Cola reduced the parties' 2009 Collective Bargaining Agreement ("CBA") to writing. As to the issue of whether the parties agreed to annual wage increases in October as opposed to the March dates included in the final signed CBA, the evidence supporting each party's position on the wage increases was fairly balanced. Accordingly, the union was not entitled to reformation of the contract. Because the union was not entitled to judgment as a matter of law and Coca-Cola was, I would reverse the judgment of the district court on the contract reformation and breach of contract issues.

Under Michigan law, a party seeking reformation of a contract on the basis of mutual mistake must prove the mutual mistake by clear and convincing evidence. *Casey v. Auto–Owners Ins. Co.*, 729 N.W.2d 277, 285 (Mich. Ct. App. 2006). As the party seeking reformation, the union has the burden of proof. *Theophelis v. Lansing Gen. Hosp.*, 424 N.W.2d 478, 486–87 (Mich. 1988) ("[T]he burden of proof is upon one seeking reformation of a written instrument."). The Michigan Supreme Court has described the clear and convincing evidence standard as "the most demanding standard applied in civil cases." *In re Martin*, 538 N.W.2d 399, 410 (Mich. 1995) (citation omitted). Clear and convincing evidence is that proof which "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and

weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Id.* (citation omitted). Put another way, evidence of mutual mistake must be so "clear and satisfactory, so as to establish the fact beyond cavil." *Crane v. Smith*, 220 N.W. 750, 751 (Mich. 1928) (citations omitted). A court of equity should not reform a written instrument "upon a probability, nor even upon a mere preponderance of evidence, but only upon a certainty of the error." *Holda v. Glick*, 20 N.W.2d 248, 251 (Mich. 1945) (citing Restatement of the Law of Contracts, § 504) (other citations omitted).

Based on the record before the district court, the union failed to prove by clear and convincing evidence that the parties actually agreed to annual wage increases on the October anniversary date of the 2009 CBA. The district court began by correctly finding that Appendix A's use of the terms "Year 1," "Year 2," and "Year 3" was ambiguous, stating "[t]he unions' October interpretation is as plausible as Coca-Cola's March interpretation." *See Local Union 2-2000 v. Coca-Cola Refreshments USA, Inc.*, 906 F. Supp. 2d 731, 742 (W.D. Mich. 2012). And yet the district court went on to hold that the Tentative Settlement Agreement ("TA") containing the same ambiguous language constituted "clear and convincing evidence that both sides reached an agreement that the percentage wage increases would likewise occur on the anniversaries of the 2009 CBA." *Id.* at 743 ("[T]he TA in this case, viewed in its larger context, is clear and convincing evidence that both sides reached an agreement that the percentage wage increases would likewise occur on the anniversaries of the 2009 CBA.").

- 15 -

The district court based its conclusion on two features of the TA. First, the three-year CBA ran from October 1, 2009, through September 30, 2012, suggesting that the annual wage increases in "Year 1, Year 2, Year 3" took effect on the October anniversary dates of the 2009 CBA. *Id.* Second, other fringe benefit increases took effect on non-anniversary dates listed in the 2009 CBA, "indicat[ing] a different treatment of the wages in the parties' agreement" and implying that the wage increases coincided with the anniversary date. *Id.*

These facts are certainly relevant to divining the meaning of the TA and tend to support the union's position. However, they do not constitute clear and convincing evidence of a mutual mistake or demonstrate "a certainty of the error" in the final written contract. *Holda*, 20 N.W.2d at 251. Each parties' interpretation of the ambiguous terms "Year 1, Year 2, and Year 3" is equally plausible and finds support in the record. Although the evidence cited by the district court is persuasive (and perhaps even preponderates), the finding of mutual mistake is simply not clear and convincing in light of other record evidence, which the district court failed to consider.

For instance, the previous CBA provided for annual wage increases in March. Union members had just received an annual raise in March 2009 and, generally speaking, were not due for another annual raise until March 2010. The TA unambiguously stated that "[a]ll terms and conditions of the [2006 CBA] shall remain in full force and effect except as modified herein." (PageID 489.) The TA supports Coca-Cola's position then that annual wage increases in the 2009 CBA would continue to take effect in March just as they did under the 2006 CBA. The provision also casts doubt on the union's position about the October dates for the wage increases.

The union argues that if "Year 1" commenced in March 2010, the "Year 1" wage freeze was to last from March 2010 to March 2011. As a result, bargaining unit members would actually go eighteen months from October 2009 until March 2011 without a raise. This argument ignores the fact that members had just received an annual bump in March 2009, six months before the 2009 CBA took effect, and would not expect another annual raise until March 2010. Thus, assuming March dates for wage increases with "Year 1" running from March 2010 through March 2011, members would, in fact, experience a twelve-month wage freeze. The union's position also ignores other evidence that Coca-Cola agreed to make two special payments to union members, a $500 "ratification bonus" in October 2009 and a $500 "lump sum payment" in January 2010, as a concession for the one-year wage freeze. *See* Dietrich Decl. ¶ 8, PageID 1060 ("Coca-Cola proposed the [payments] . . . to partially balance Coca-Cola's proposal for the 'Year 1' wage freeze . . . ."). Therefore, there is evidence from the TA to support Coca-Cola's position about the March dates for wage increases.

Furthermore, the 2009 CBA included dates certain for increases in fringe benefits, but the district court failed to consider evidence showing that the TA simply carried over the same dates from the 2006 CBA. *E.g.* 2006 CBA, PageID # 449 (providing for annual increases, which would take effect in May, in Coca-Cola's match for employee 401k contributions); *Local Union 2-2000*, 906 F. Supp. 2d at 734–35 (noting that the 2009 CBA provided for annual 401k matching increases in May as well). This is hardly surprising in light of the parties' agreement that the terms of the 2009 CBA would default to the terms of the 2006 CBA "except as modified." The fact then that the

parties agreed in the 2009 CBA to annual benefits increases and on the same dates provided in the 2006 CBA support Coca-Cola's position (as much as the union's) and suggests that the parties assumed wage and benefit increases under the 2009 CBA would continue to occur annually and on the same dates provided in the 2006 CBA.

The district court also placed weight on the three-year duration of the 2009 CBA. *Id.* at 743 ("The TA provided that the 'agreement duration' was 'October 1, 2009—September 30, 2012.'"). This aspect of the TA is arguably the most compelling evidence for the union's position that wage increases were due on the October anniversary dates of the 2009 CBA. Even so, whether wage increases were due in October or the following March, wage increases would still take effect during "Year 1" or "Year 2" or "Year 3" of the CBA. For example, if "Year 1" ran from October 2009 through October 2010, then a wage increase due in March 2010 would take effect during "Year 1." The union retorts that the notion of a six-month "Year 1" or an eighteen-month "Year 3" is incomprehensible. Union's Br. 39 ("In Wonderland, a 'year' may last 18 months on some occasions and six months on others, depending on Humpty Dumpty's mood.").

However, the union's own course of dealing undercuts its argument on this point. During the negotiations, the union made the initial offer on wage increases, proposing that the new CBA run from October 1, 2009, through March 27, 2013, and that bargaining unit members receive a 3% raise in "Year 1," a 3.5% raise in "Year 2," and a 4% raise in "Year 3." (PageID 458.)[1] Assuming

---

[1]Similarly, the 2006 CBA ran from March 25, 2006, to September 30, 2009, a term of three years and six months. The fact that the parties' previous CBA included only a portion of a year

that "Year 1" began in October 2009, the union's offer of a three and a half-year term obviously

meant that "Year 3" would run from October 2011 through March 2013, a span of eighteen months.

Thus, the union itself proposed the very Carrollian treatment for "the word 'year' as sometimes

meaning 18 months" that it so colorfully derides in this appeal. *See also* Union's Br. 37 ("The

parties never agreed to treat the word 'year' as sometimes meaning 18 months and sometimes six

months. The parties never agreed that contract years should run inconsistently, from October 2009

until mid-March 2011 for 'Year 1,' from mid-March 2011 until mid-March 2012 for 'Year 2,' and

from mid-March 2012 through September 2012 for 'Year 3.'").

The union's bargaining also runs counter to the union's position on appeal that the only

possible, intended meaning of "Year 1, Year 2, Year 3" was the three-year term of the 2009 CBA.

The union introduced the "Year 1, Year 2, Year 3" concept into the negotiations on September 28,

2009, the parties' last day at the bargaining table. *Local Union 2-2000*, 906 F. Supp. 2d at 735. The

parties signed the TA only hours after the union first proposed the ambiguous "Year 1, Year 2, Year

3" language and did so in such a way that "Year 3" actually meant eighteen months, and not twelve.

This is hardly clear and convincing proof that the parties could only have understood the TA's "Year

1, Year 2, Year 3" to be literal, twelve-month years.

Perhaps more importantly, the union's initial offer arguably assumed March wage increases,

with the 3% raise in "Year 1" taking effect in March 2010, the 3.5% raise in "Year 2" in March

---

further undercuts the inference that "Year 1," "Year 2," and "Year 3" clearly and necessarily refer
to full twelve-month periods and not some fraction of a year covered by the CBA.

2011, the 4.0% raise in "Year 3" in March 2012, and the CBA expiring in March 2013. Otherwise, the union's proposed "Year 1, Year 2, Year 3" language makes less sense. If the union was bargaining for October wage increases, as it now claims, the 3% raise in "Year 1" would take effect October 2009, the 3.5% raise in October 2010, and the final 4% raise in October 2011. Bargaining unit members would then go from October 2011 through the expiration of the CBA in March 2013 without a raise. In other words, the union was proposing the ambiguous "Year 1" approach to the wage increases under terms that would leave its membership without any raise for the final eighteen months of a forty-two month CBA. Therefore, the union's initial offer with the "Year 1, Year 2, Year 3" language plausibly shows that the union assumed wage increases in March and calls into doubt the district court's conclusion that the TA's use of "Year 1, Year 2, Year 3" constituted clear and convincing evidence of October wage increases.

In sum, none of the features of the TA cited by the district court amount to clear and convincing evidence of a mutual mistake in the final signed writing. I do not mean to say that the evidence clearly proves that the parties reached a final agreement for March wages increases. Indeed the parties' final signed writing suffices to prove the March dates. The district court highlighted the lack of evidence showing that the parties ever agreed to the March dates for the wage increases. *Local Union 2-2000*, 906 F. Supp. 2d at 744. However, because the union seeks reformation of a signed contract, the relevant inquiry is whether there is clear and convincing evidence of an agreement on the October dates. As the party seeking reformation, it is the union's burden to prove that the parties actually agreed on the October dates for annual wage increases, and

not Coca-Cola's to prove the March dates. *Theophelis*, 424 N.W.2d at 486–87. For the reasons already discussed, the union failed to carry its burden to show a mutual mistake in the final signed writing.

Having concluded that the union failed to show by clear and convincing evidence that the March dates were a mistake, the district court's reformation of the CBA should be reversed. Without proof of an agreement as to the October dates, reformation was improper. *Hunt v. Triplex Safety Glass Co. of N. Am.*, 60 F.2d 92, 94 (6th Cir. 1932) ("Before a contract may be reformed to express the true agreement of the parties, *they must have so agreed*, and we fail to find sufficiently cogent proof of such agreement.") (emphasis added and internal citation omitted); *Casey*, 729 N.W.2d at 284–85 ("A court of equity has the authority to reform a contract to make it conform to the agreement *actually made* by the parties to the contract.") (emphasis added).[2]

Notably the district court reached the reformation issue on the parties' cross-motions for summary judgment. In order to prevail at summary judgment, the union had the burden to prove a mutual mistake in the final signed writing by clear and convincing evidence, Michigan's "most demanding standard" in civil cases, and to do so in such a way that reasonable minds could not differ. *In re Martin*, 538 N.W.2d at 410. In other words, the union had a doubly-demanding burden

---

[2]Without proof of an actual agreement on dates certain for the annual wage increases, the TA's default term, i.e. that "[a]ll terms and conditions of the [2006 CBA] shall remain in full force and effect," would arguably control.

to make its case at summary judgment. When viewed from this perspective, the district court misapplied the Rule 56 standard by granting the union judgment as a matter of law.

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The precise issue presented to the district court in the union's Rule 56 motion was whether the union could "prove by clear and convincing evidence to the degree that no rational finder of fact could conclude otherwise" that a mutual mistake had occurred where the final writing included March dates for annual wage increases. *Hanover Ins. Co. v. Am. Eng'g Co.*, 33 F.3d 727, 730 (6th Cir. 1994) (applying Kentucky law and reversing the reformation of a contract based on mutual mistake at summary judgment). Viewing the evidence in the light most favorable to Coca-Cola, as the district court was required to do in deciding the union's Rule 56 motion, the union failed to carry its burden. The evidence before the district court was insufficient to grant the union's request for reformation because the union did not show a mutual mistake "by clear and convincing evidence to the degree that no rational finder of fact could conclude otherwise," an essential element of the union's reformation claim on which it alone bore the burden of proof. Therefore, the district court misapplied the summary judgment standard and erroneously granted the union judgment as a matter of law on the reformation issue.

What is more, the district court also failed to apply the correct standard in denying Coca-Cola's Rule 56 motion. We have held that "any heightened burden of proof required by [governing]

substantive law for an element of the [non-moving party]'s case, such as proof by clear and convincing evidence, must be satisfied by the [non-moving party]" in order to survive summary judgment. *Beal ex rel. Putnam v. Walgreen Co.*, 408 F. App'x 898, 902 (6th Cir. 2010) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). In other words, the non-moving party must "show in opposition to the motion for summary judgment that [it] can produce evidence which, if believed, will meet the higher standard." *Inge v. Rock Fin. Corp.*, 388 F.3d 930, 938 (6th Cir. 2004).

Not only was the union not entitled to judgment as a matter of law, summary judgment in favor of Coca-Cola was proper because the union did not carry its "higher" burden. Even under the most favorable view of the proof, the union failed to adduce clear and convincing evidence of mutual mistake to support its plea for reformation. Rather the parties have essentially litigated to a draw. Instead of evaluating whether the union could meet its "higher" burden at summary judgment, the district court apparently shifted the burden to Coca-Cola to produce evidence in support of its claim about the March dates for wage increases. *See Local Union 2-2000*, 906 F. Supp. 2d at 744 (finding that Coca-Cola "fails to provide evidence of agreement to the contractual language, other than to proffer the subsequent statements of Coca-Cola's negotiators that Coca-Cola did not consider the March dates a 'mistake' . . . .").[3] The district court improperly allocated the

---

[3]The majority takes a similar approach, holding Coca-Cola to the burden to prove the absence of mistake as opposed to requiring the union to prove mutual mistake by clear and convincing evidence. In fact, the majority never states that the union adduced clear and convincing evidence of mutual mistake or that it did so "to the degree that no rational finder of fact could conclude otherwise." *Hanover Ins. Co.*, 33 F.3d at 730.

burden to Coca-Cola and then weighed Coca-Cola's failure to prove the March dates in arriving at its conclusion to reform the contract. The district court should have focused on whether the union, as the party seeking reformation, had adduced clear and convincing evidence of the October dates, and not faulted Coca-Cola for failing to prove up the March dates in the final writing. In the absence of clear and convincing evidence of a mutual mistake, Coca-Cola was entitled to judgment as a matter of law on the reformation claim.

Both parties present cogent positions, which is exactly the problem with the district court's decision to reform the 2009 CBA. The roughly equal strength of both arguments highlights the fact that the union did not carry its burden to establish a mutual mistake in the final writing by clear and convincing evidence. Rather than being "weighty and convincing" proof of a mutual mistake, the TA does not clearly and convincingly point to October dates for the wage increases in the 2009 CBA. *In re Martin*, 538 N.W.2d at 410. The union has merely shown that the parties' TA provided for wage increases in "Year 1, Year 2, and Year 3." This proof is not clear and convincing evidence that the parties had actually agreed on October wage increases. *Hunt*, 60 F.2d at 94; *Casey*, 729 N.W.2d at 284–85. Therefore, I would reverse the judgment of the district court on the contract issues.